In re Gary Lynn BULLINGTON and Dixie Lee Bullington, Debtors.

Richard OETKER, Jr. and Pat Oetker, Plaintiffs;

v.

Gary Lynn BULLINGTON and Dixie Lee Bullington, Defendants.

Bankruptcy No. 93–30452.
Adv. No. 94–3002.

United States Bankruptcy Court, W.D. Missouri.

April 15, 1994.

John C. Banning, Springfield, MO, for plaintiffs.

Robert Parrish, Joplin, MO, for debtors/defendants.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Plaintiffs in this adversary proceeding claim that debtor/defendants ("debtors") converted and embezzled cattle and proceeds belonging to plaintiffs, and obtained such cattle from plaintiffs by false pretenses and misrepresentations. Therefore, plaintiffs ask that debtors' obligation to them be excepted from discharge in this Chapter 7 bankruptcy case. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that debtors were at all times operating as a partnership and converted to their own use 104 of plaintiffs' dairy cows and 132 calves in which plaintiffs had a security interest. Thus, a debt in the sum of $129,310.00 is excepted from discharge as to both debtors pursuant to 11 U.S.C. § 523(a)(6). As to the embezzlement and false representations allegations, I find for the debtors.

## FACTUAL BACKGROUND

The debtors Gary and Dixie Lee Bullington ran Bullington Dairy Farm for fifteen years. On November 25, 1989, both debtors signed a hand-written contract to lease cattle from Richard and Pat Oetker for $40.00 per month per cow and "$100.00 per calf." Pl. Exh. # 6. Debtors picked up ten heifers and two calves at the time they signed the contract. On May 6, 1990, Gary Bullington and Pat Oetker executed a lease for 104 dairy cows. Pl. Exh. # 1. The term of the lease was two months but it was subsequently extended up to and including July 6, 1991. The parties to the lease agreed that the lessee would pay $40.00 per month per cow for the term of the lease. The lease provided that Mr. Bullington would pay to plaintiffs the sum of $1000.00 for any cow not recovered at the end of the term.

On May 28, 1991, Gary Bullington and Pat Oetker executed a lease for 132 calves weighing 200–600 pounds for a term of 15½ months. Pl. Exh. # 2. There were no rental terms delineated in this lease, however, the parties apparently agreed that Gary Bullington would pay plaintiffs $1,000.00 per month beginning July 1, 1990, until the sum of $15,310.00 plus interest had been paid. No interest charge was specified. In the Spring of 1991, Gary Bullington and plaintiffs made an oral lease for twenty-seven dairy cows with calves. Gary Bullington did not contest the existence of this lease.

Debtors made payments under these leases until May 6, 1991. Since that time, debtors have made one payment in the sum of $1000.00 in October of 1991.[1] Pl. Exh. # 3. Plaintiffs made several demands for the return of their cattle prior to the Fall of 1991. When debtors failed to return any cattle, plaintiffs presented debtors with a Uniform Commercial Code financing statement covering 103 Holstein Cows, which both debtors signed. That financing statement was filed with the State of Missouri–County of Newton on October 24, 1991. Pl. Exh. # 14. At the time debtors signed the financing statement they had only five cows in their possession.

---

1. A check written to plaintiffs by Gary Bullington on May 16, 1990, in the sum of $4,210.00 was returned for insufficient funds on May 22, 1990. Pl. Exh. # 4.

Gary Bullington admitted that he sold cattle belonging to plaintiffs, without paying over the proceeds. This was not the first time he sold someone else's cattle. In October 1991, the same month in which the debtors signed the financing statement for the Oetkers, Gary Bullington was convicted of selling mortgaged cattle belonging to the Farmer's Home Administration and was sentenced to three years probation.

Plaintiffs filed a Petition in state court for conversion of property valued at $218,300.00. That cause of action was set for trial in the Circuit Court on November 4, 1993. In anticipation of the trial, debtors filed a Chapter 7 bankruptcy petition on October 29, 1993, in which they listed plaintiffs' debt in the sum of $139,700.00.

### DISCUSSION

Plaintiffs bring this Complaint in four Counts. I will first analyze each of these counts as to Mr. Bullington. I will then analyze the case against Mrs. Bullington.

■ Count I seeks $182,200.00 for the embezzlement by debtors of 104 dairy cows with a value of $1,000.00 each and 132 calves with a value of $600.00 each. Count IV seeks $36,100.00 for the embezzlement of 27 cows with calves. Section 523(a)(4) of the Bankruptcy Code (the "Code") provides that:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4). Embezzlement is the "fraudulent appropriation of property of another by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir.1988). *See also* 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 523.14[3] at 523–113 (15th ed. 1993). The burden is on the plaintiff to establish that the debtor was not lawfully entitled to use the property as it was actually used. *Id.* Where a state embezzlement statute requires that the alleged offender be a fiduciary, a debt owed by a nonfiduciary debtor cannot be found non-dischargeable under section 523(a)(4). 1B Bkr.L.Ed. § 10A:142 at 115 (1990); *Carlson, Inc. v. Commercial Discount Corp.*, 382 F.2d 903, 905 (10th Cir.1967); *Greyhound Lines, Inc. v. Fains (In re Fains)*, 37 B.R. 539, 543 (Bankr.E.D.Pa.1984). In Missouri, a plaintiff must demonstrate the existence of a fiduciary relationship before the statutory crime of embezzlement can lie. Mo.Stat.Ann. §§ 570.-010(2) and 570.030.3(3)(i) (Supp.1993); *State v. Anderson*, 232 S.W.2d 909, 911 (Mo.1950); *State v. Reed*, 815 S.W.2d 474, 476 (Mo.Ct.App.1991); *State v. Grainger*, 721 S.W.2d 237, 239 (Mo.Ct.App.1986); *State v. David*, 687 S.W.2d 237, 239 (Mo.Ct.App.1984). There is no evidence in this case that the relationship between plaintiffs and debtors was anything more than that of lessor/lessee. The class of fiduciaries included in section 523(a)(4) is limited to "trustees of specific written declarations of trust, guardians, administrators, executors, and public officers." *Moore v. Holman (In re Holman)*, 42 B.R. 848, 851 (Bankr.E.D.Mo.1984) (quoting *Chapman v. Forsyth*, 2 HOW 202, 43 U.S. 202, 207, 11 L.Ed. 236 (1844)). Since plaintiffs failed to establish a fiduciary relationship in order to recover under an embezzlement theory, I need not reach the second element of embezzlement which requires a showing of debtors' evil intent. *Schubert v. American Press*, 323 Mo. 299, 19 S.W.2d 472, 475 (1929). Therefore, as to Counts I and IV, I find for the debtors.

■ Count III alleges that debtors obtained the 104 cows and 132 calves by false pretenses and false representations. Plaintiffs in effect contend that at the time debtors obtained livestock from plaintiffs, debtors knew they would not be able to repay the obligations being incurred. Section 523(a)(2)(A) provides that:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money [or] property ... obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition;

11 U.S.C. § 523(a)(2)(A). In the Eighth Circuit, in order to have a debt held non-dischargeable under section 532(a)(2)(A), the creditor must prove that: (1) the debtor made representations; (2) at the time the representations were made the debtors knew them to be false; (3) the debtors made the representations with the intention or purpose of deceiving creditors or the Court; (4) there was reliance on those representations; and (5) injury was sustained as a result of those representations. *See Ophaug v. Thul (In re Ophaug)*, 827 F.2d 340, 342 (8th Cir.1987). *Ophaug* also holds that only actual fraud, and not fraud implied in law, satisfies section 523(a)(2)(A). *Id.* at 342 n. 1. Gary Bullington testified that at the time he and his wife began doing business with the Oetkers, he felt the profit he would derive from selling the milk from an additional 104 cows would service the lease and pay their other creditors. I note that at the time the debtors began doing business with the Oetkers, they had already sold other creditors' cattle. However, Mr. Bullington did make partial payments under the lease until May 6, 1991. Pl. Exh. # 3. For that reason, I find that plaintiffs failed to sustain their burden of proof that debtors intended to defraud plaintiffs at the time they entered into any of the transactions with plaintiffs. Therefore, I find for the debtors as to Count III of plaintiffs' Complaint.

▬▬ Count II pleads for judgment against debtors for $183,200.00 for debtors' willful and malicious injury to plaintiffs. Section 523(a)(6) of the Code provides that:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6). While plaintiffs do not specifically designate conversion as the willful and malicious injury which is referenced in their Complaint, plaintiffs incorporated all of the allegations in Count I which included a claim for conversion. Conversion is not specifically excepted from discharge in section 523(a), however, conversion is analyzed under section 523(a)(6). *See* 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 523.16[3], at 523–129–30 (15th ed. 1993). Under the Bankruptcy Act of 1898, the Supreme Court held that "a conversion of property (a simple interference with legal rights) is not enough in itself to prevent discharge of a debt." *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 879 (8th Cir.1985) *citing Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332–33, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). The conversion referenced in *Davis* has been termed a "technical conversion" as opposed to a "willful conversion" such as intentionally selling a secured creditor's collateral without such creditor's consent. *3 Colliers* ¶ 523.16[3] at 523–130–31. Courts have held that the conversion of another's property done intentionally and maliciously without that person's knowledge or consent is a willful and malicious injury within the meaning of section 523(a)(6). *See McIntyre v. Kavanaugh*, 242 U.S. 138, 141, 37 S.Ct. 38, 39, 61 L.Ed. 205 (1916); *Cecchini v. Robustelli (In re Cecchini)*, 780 F.2d 1440, 1443 (9th Cir.1986); *Colliers* at 523–130. In this instance I must first determine if any conversion has taken place. It is undisputed that plaintiffs owned 104 cows and 132 calves that were voluntarily placed in the possession of debtors. As to the 104 cows, Pat Oetker and Gary Bullington executed a lease which set forth the term of the lease, the lease payments, and specified liquidated damages of $1000.00 per cow for any cow not returned when the term of the lease expired. Debtors do not dispute that none of the 104 cows was returned to plaintiffs, despite demand having been made. Mr. Bullington admitted that he sold some of plaintiffs' cows.[2] Given the undisputed testimony that Mr. Bullington

---

**2.** Mr. Bullington also testified that another farmer, who apparently believed that cattle he had leased to the Bullingtons had also been sold, came to the Bullington Dairy Farm and picked up some of the Oetkers' cattle. Mr. Bullington did nothing to stop this other creditor, and did not notify either the Oetkers or any authorities.

converted plaintiffs' property, and given the fact that Mr. Bullington signed a financing statement for 103 heifers when there were, in fact, five cows in his possession, I find that his conduct caused a willful and malicious injury to plaintiffs. Therefore, the debt of $104,000.00 is a non-dischargeable obligation as to him pursuant to section 523(a)(6).

 As to the 132 calves, the document executed by Pat Oetker and Gary Bullington on May 28, 1991, which purports to be a lease, sets forth no terms and no payments. Pl. Exh. # 2. Hand-written on the last page of the typed document is the following clause initialed by Gary Bullington: "$1,000.00 per month start [sic] July 1 [sic] 1990 [sic] $15,-310 plus interest until pay of [sic]." I can only construe this document to be a contract for the sale of 132 calves for a sum of $15,-310.00. This construction is aided by the fact that the first contract, on November 25, 1989, makes reference to calves at $100.00 per calf. This construction is further aided by the fact that, unlike dairy cows which can be milked, calves have no income potential until such time as they are sold. Therefore, I find that as to the 132 calves, the lease was really a contract for sale, which transferred ownership of the calves to debtors subject to a security interest retained by the Oetkers. *See* Mo.Stat.Ann. §§ 400.1–201(14), (32), (33), (37). But whether a lease or a sale, the Oetkers retained rights in the cattle. The selling of such collateral by the debtor without first obtaining the secured creditor's consent is a conversion. *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 879 (8th Cir.1985) *citing Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 330, 55 S.Ct. 151, 152, 79 L.Ed. 393 (1934). In order for a conversion to be more than a mere technical conversion, there must be a showing of egregious conduct. *Long* at 879. Mr. Bullington admitted to selling the calves in which plaintiffs had legal rights, and offered no satisfactory explanation of what happened to the proceeds of such sale. Therefore, I find that Mr. Bullington's egregious conduct willfully and maliciously caused plaintiffs injury rendering the debt for $15,-310.00 non-dischargeable.

I now turn to the case against Mrs. Bullington. There are two main issues to consider. The first is whether she and her husband were business partners. Assuming so, the second issue is whether she is liable as well for the willful and malicious conversion of plaintiffs' cattle.

 Debtors claim that Gary Bullington alone sold cattle belonging to plaintiffs, and that the debt should be dischargeable as to Dixie Lee Bullington. Plaintiffs claim that at all times both debtors were engaged in a partnership or a joint venture. In the state of Missouri a partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." Mo. Stat.Ann. § 358.060(a) (1968). A joint venture is in the nature of a partnership, and is governed by the same rules of law, but is usually limited to a single transaction. *Bell v. Green*, 423 S.W.2d 724, 731 (Mo.1968). "The rights of joint adventurers are governed by rules applicable to partnerships." *Stram v. Miller*, 663 S.W.2d 269, 277 (Mo.Ct. App.1983). *See also Kielhafner v. Kielhafner*, 639 S.W.2d 288 (Mo.Ct.App.1982) (the partnership agreement need not be written but may be expressed orally or implied from acts and conduct of the parties, with the intent of the parties serving as the primary criterion for determining whether such a relationship exists). There is no written partnership agreement between Dixie Lee Bullington and Gary Bullington. Therefore, I must look to their acts and conduct to determine whether Bullington Dairy Farm was a partnership. Mrs. Bullington testified to the following facts: (1) she and Mr. Bullington owned two tracts of land in both of their names; (2) the checking account was in the name of Bullington Dairy Farm and the signatories were both she and Gary Bullington;[3] (3) she had no off-farm income until 1992; (4) she signed any documents related to Bullington Dairy Farm that Gary Bullington asked her to sign; (5) she milked cattle at the farm three full days and two partial days each week; (6) she did not receive or request wages for her labor; (7) she benefit-

---

**3.** Mrs. Bullington at first stated she did not have check writing authority. She later modified that statement to say she could write checks but rarely did so.

ted from any income realized by Bullington Dairy Farm; and (8) she and Gary Bullington filed joint income tax returns. She also testified that she made no business decisions and only signed documents when told to do so by her husband. She stated she did not know they were leasing cows from the plaintiffs, even though she went with Gary to the Oetker farm at the time the contract was signed to do just that. She also stated she did not know that her husband was selling other people's cattle, even though she herself milked said cattle five days each week. Mrs. Bullington did admit that she knew there were only five cows left on the farm in October of 1991, when she signed the financing statement which falsely stated the debtors had 103 heifers in their possession. She stated she signed the financing statement, knowing they did not have 103 cattle, because Gary insisted, though he did not threaten her in any way.

I am clearly convinced that the Bullingtons were acting as partners engaged in operating a partnership. *Grissum v. Reesman*, 505 S.W.2d 81, 85–86 (Mo.1974). Therefore their actions are controlled by state partnership law. In Missouri, a partnership is bound by the wrongful act of any partner acting in the ordinary course of business. Mo.Stat.Ann. § 358.130 (1968). The partnership is also required to make up any loss sustained where one partner acting within the scope of his apparent authority misapplies the property of another. Mo.Stat.Ann. § 358.140(1) (1968). "All partners are liable jointly and severally for everything chargeable to the partnership under sections 358.-130 and 358.140, and for all other debts and obligations of the partnership." Mo.Stat. Ann. § 358.150 (1968). Even though there is no evidence of Mrs. Bullington's direct involvement in the conversion of 104 of plaintiffs' cattle and 132 calves in which plaintiffs had a security interest, it is undisputed that Mr. Bullington was acting on behalf of Bullington Dairy Farm when he engaged in the wrongful acts. Further, at a minimum, Mrs. Bullington participated in the benefits of the conversion.

In a dischargeability proceeding for conversion, the willful and malicious acts of one partner, committed in the ordinary course of business, are imputed to other partners such that any debt is non-dischargeable as to them as well. *McIntyre v. Kavanaugh*, 242 U.S. 138, 139, 37 S.Ct. 38, 39, 61 L.Ed. 205 (1916); *Cecchini v. Robustelli (In re Cecchini)*, 780 F.2d 1440, 1444 (9th Cir. 1986); 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 523.08[4] at 523–57 n. 23 (15th ed. 1993). Since Mr. Bullington's admitted conversion is imputed to Mrs. Bullington as his partner in this partnership, the debt for $129,310.00 is also non-dischargeable as to her.[4]

### CONCLUSION

As to Count I of plaintiffs' Complaint, I find for the debtors.

As to Count II of plaintiffs' Complaint, I find for the plaintiffs in the sum of $129,-310.00, such sum to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

As to Count III of plaintiffs' Complaint, I find for the debtors.

As to Count IV of plaintiffs' Complaint, I find for the debtors.

An order in accordance with this Memorandum Opinion will be entered this date.

---

4. Though unrelated to the outcome in this opinion, I do not find it credible that Mrs. Bullington failed to notice that the herd of dairy cows, at least some of whom she milked every day, decreased in size from more than 150 cows to five cows over an eighteen month period of time.