In re Jerry Michael FORD, Debtor.

Barbara Ann Pharr, Executrix of the Last Will and Testament of Hollis Haynes Pharr, deceased, Juanell Pharr, Toy Pharr, III, Angela Pharr Armstrong, Tony Pharr, Sonya Pharr Buff, and Corey Pharr, the statutory heirs at law of Toy Pharr, Jr., deceased, Plaintiffs,

v.

Jerry Michael Ford, Defendant.

Bankruptcy No. 00–13371.
Adversary No. 00–1238.

United States Bankruptcy Court,
N.D. Mississippi.

Sept. 28, 2001.

John A. Hatcher, Booneville, MS, for plaintiff.

Selene D. Maddox, Tupelo, MS, for defendant.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a complaint filed by Barbara Ann Pharr, Executrix of the Last Will and Testament of Hollis Haynes Pharr, deceased, Juanell Pharr, Toy Pharr, III, Angela Pharr Armstrong, Tony Pharr, Sonya Pharr Buss, and Corey Pharr, the statutory heirs at law of Toy Pharr, Jr., Deceased, referred to collectively herein as plaintiffs; an appropriate answer having been filed by the above captioned debtor, Jerry Michael Ford, referred to herein as Ford or defendant; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the subject matter of and the parties to this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

Although the plaintiffs raised alternative theories of recovery under 11 U.S.C. § 523(a)(4) and § 727(a), the court is of the opinion that this cause of action is specifically addressed in 11 U.S.C. § 523(a)(6). As such, the alternative theories are not well taken and will not be considered further.

The defendant did not request the court to consider whether the doubling of actual damages, the statutory penalties, the reforestation assessment, and the taxation of costs were dischargeable obligations as separate components from the award of actual damages. Consequently, this question is not addressed in this opinion.

### II.

The defendant, Jerry Michael Ford, employed Byron Pounders, an independent logger, to cut and harvest the pine and hardwood timber located on his property. Pounders, however, also inadvertently or intentionally cut the timber on a tract of land, adjoining Ford's property, which was owned by the plaintiffs' predecessors in title. For simplicity, this property will be referred to in this opinion as the Pharr property. The cutting operation undertak-

en by Pounders commenced in May, 1998, and terminated sometime in August, 1998.

In early 1999, Tony Pharr, one of the plaintiffs herein, discovered that the timber had been cut on the Pharr property. He notified the Mississippi Department of Agriculture and Commerce which initiated an investigation conducted by Keith Settlemiers, an investigator in the Theft Division. Settlemiers presented the results of his inquiries to the Office of the District Attorney for the First Judicial District of Mississippi, but no criminal prosecution was authorized. Settlemiers was informed by the District Attorney that the incident was a civil matter. This conclusion is consistent with the finding of this court that this cause of action should not be premised on 11 U.S.C. § 523(a)(4), which excepts from discharge a debt resulting from larceny.

Thereafter, the plaintiffs initiated a cause of action against Ford and Pounders in the Circuit Court of Prentiss County, Mississippi. A judgment was ultimately entered in favor of the plaintiffs for the following amounts:

| | |
|---|---|
| Actual damages of $120,000.00, doubled by statute | $240,000.00 |
| Statutory penalty—200 trees 7″ or more in diameter ($55.00 per tree) | 11,000.00 |
| Statutory penalty—500 trees less than 7″ in diameter ($10.00 per tree) | 10,000.00 * |
| Reforestation assessment | 10,000.00 |
| Costs | 148.00 |
| 25% attorney's fees | 67,787.00 |
| Total | $338,935.00 |

*(The court notes that either a multiplication error occurred or 1000 trees were actually cut.)

The assessment of the damages in the judgment was based on an affidavit and testimony provided by Tony Pharr, an experienced logger, who, as noted above, was then and is now a named plaintiff. The defendant has not requested this court to revisit the amounts specified in the state court judgment. Candidly, the court would be reluctant to do so. The court, however, would be remiss in not mentioning the following points:

1. The award of actual damages in the sum of $120,000.00, which was doubled by statute, represents the value of the trees improperly cut by Pounders *exclusively* from the Pharr property. According to Tony Pharr, the size of the tract of land from which these trees were harvested was approximately 42 acres. This represents a timber value of almost $3,000.00 per acre.

Ford testified, without contradiction, that he received from Pounders, as his portion of the total sales proceeds, approximately $22,000.00. This number is fairly consistent with Pounders' original estimate of the timber value which ranged from $22,000.00 to $27,000.00. What Ford received in proceeds must be considered with the fact that timber was not just harvested from the Pharr property, but also from Ford's property, which was larger in acreage than the Pharr property.

The purpose of this comment is to point out the disparity in the award of actual damages at the state court level compared to the net amount of money received by Ford, as well as, to illustrate the sizeable value of timber ostensibly removed from a 42 acre parcel of property. If the amount of actual damages is even remotely accurate, the court questions where the money went. Perhaps Pounders, who also had to file bankruptcy, exercised less than keen insight in marketing what he had cut. Coincidentally, many of the sales made by Pounders were to Hollis Pharr's Sawmill in Marietta, Mississippi.

2. After Ford filed his bankruptcy case, an order was entered on January 31, 2001, lifting the automatic stay to allow the

plaintiffs to enforce their judgment against Ford's non-exempt real property which adjoined the Pharr property. At a subsequent execution sale, Tony Pharr acquired Ford's property, presumably for the benefit of all of the plaintiffs, by satisfying an existing first lien on the property held by AmSouth Bank in the sum of $2,717.67, and by paying other costs and attorney's fees for a total consideration of $12,000.00. The "lion's share" of this payment went coincidentally to the plaintiffs' attorney.

As noted in the deed description, Ford's property comprised approximately 59.66 acres. (80 acres less 20.34 acres conveyed to the State of Mississippi.) The net value of this property should be credited against the plaintiffs' state court judgment.

## III.

### THE STANDARD APPLICABLE TO § 523(a)(6) CAUSES OF ACTION

■ In an opinion authored by Judge Patrick E. Higginbotham, the Fifth Circuit Court of Appeals articulated the appropriate standard for the application of § 523(a)(6) of the Bankruptcy Code in *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, as follows:

> The Supreme Court recently answered the "pivotal question" of whether § 523(a)(6) covers "acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 60, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). The Court's conclusion was that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* This conclusion was similar to one that the Fifth Circuit had reached in analyzing § 523(a)(6). In

*Corley v. Delaney (In re Delaney)*, 97 F.3d 800 (5th Cir.1996), this court reaffirmed its earlier holding that "for willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted" and not just performed an intentional act that resulted in injury. *Id.* at 802.

> Before we can determine whether the findings of the jury in the state court conclusively determine whether Miller inflicted a "willful ... injury," we must grasp the Supreme Court's insistence on "actual intent to cause injury." The Supreme Court's disposition in Kawaauhau certainly eliminates the possibility that "willful" encompasses negligence or recklessness. See *Kawaauhau*, 523 U.S. at 64, 118 S.Ct. at 978 ("We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).").

> At least three remaining readings are possible. The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury. We hold that the label "intentional tort" is too elusive to sort intentional acts that lead to injury from acts intended to cause injury. Rather either objective substantial certainty or subjective motive meets the Supreme Court's definition of "willful ... injury" in § 523(a)(6).

156 F.3d 598 at 602.

> Most often, an intentional tort requires either objective substantial certainty of harm or subjective motive to do harm. Indeed, the presence of one of these factors is both necessary and sufficient for a tort to be classified as an "intentional tort" under the traditional modern definition. See *Kenneth J. Vandevelde, a History of Prima Facie Tort:*

*The Origins of a General Theory of Intentional Tort,* 19 Hofstra L.Rev. 447, 447 (1990) (describing "intentional torts" as those where "the defendant acted with the intent to injure the plaintiff or with substantial certainty that his action would injure the plaintiff").

Thus, rather than allow the general classification of a tort to be a talisman, we hearken back to this original definition of "intentional tort" to determine whether injury is "willful" for § 523(a)(6) purposes. This test is fully consistent with our precedent. Delaney, which remains good law because the Supreme Court in no way contradicted it, equated intending actual injury to a situation in which "the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." *Delaney,* 97 F.3d at 802. Although Delaney did not address whether a subjective motive to injury would alternatively be sufficient to trigger § 523(a)(6), it would seem peculiar to deem an action causing injury not "willful" when the tortfeasor's action was in fact motivated by a desire to cause injury.

*Id.* at 603.

The Fifth Circuit so far has taken a clear path, albeit without analysis of the confused jurisprudence. *Vickers v. Home Indem. Co.,* 546 F.2d 1149 (5th Cir.1977), defined "malicious" as " 'without just cause of excuse.' " *Id.* at 1150 (quoting 1A Collier, Bankruptcy ¶ 17.17, at 1650.4 to 1650.6 (1976)); see also *Corley v. Delaney (In re Delaney),* 97 F.3d 800, 802 n. 6 (5th Cir.1996); *Seven Elves, Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983); *Petty v. Dardar (In re Dardar),* 620 F.2d 39, 40 (5th Cir. 1980).

*Id.* at 605.

The "just cause or excuse" approach is peculiarly inappropriate, however, given the Supreme Court's definition of "willful ... injury" in *Kawaauhau.* Where injury is intentional, as it now must be under *Kawaauhau,* it cannot be justified or excused. Eliminating the "just cause or excuse" exception would not ensnare those who have acted under "an honest, but mistaken belief." Such an individual cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of "not substantially certain to result," in the absence of the fact about which there has been mistake.

Thus, we adopt the alternative definition of "implied malice." Because this standard is synonymous to the Kawaauhau standard for "willful injury," "acts done with the actual intent to cause injury," *Id.* at 57, 118 S.Ct. at 975, we hold that this is the test for "willful and malicious injury" under § 523(a)(6). Thus, we hold that an injury is "willful and malicious" where there is either an objective substantial certainty of harm or a subjective motive to cause harm.

Kawaauhau does not foreclose, even encourages, this approach. That case never makes explicit whether it is analyzing solely the "willful" prong or the "willful and malicious" standard as a unit. Aggregating "willful and malicious" into a unitary concept might be inappropriate if the word they modified were "act," but treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is "injury."

*Id.* at 605 and 606.

An interesting discussion of this issue can be found in the October, 1999, edition of the *Florida Bar Journal* in an article written by William A. Roundtree, "The Willful and Malicious Injury Exception to

Discharge in Bankruptcy: Just How Narrow Should It Be?" 73–OCT Fla.B.J. 78.

## IV.

### CONCLUSION

■ In order to apply the standard discussed in *Miller* to the facts of this proceeding, this court must focus on the parameters of Ford's intent and motive. As enunciated by the Supreme Court in *Kawaauhau*, the court must consider as a part of this analysis whether Ford's actions were "done with the actual intent to cause injury." The testimony of the witnesses who had personal knowledge of what actually transpired must be carefully examined.

Byron Pounders, who cut the timber, was a co-defendant in the state court lawsuit and was jointly and severally liable with Ford on the resulting judgment. Pounders filed a separate bankruptcy case and received a discharge. No complaint was filed against him seeking to have the plaintiffs' judgment indebtedness excepted from discharge.

Pounders concurred with the testimony of Tony Pharr that there are generally two methods by which loggers contract to cut and harvest timber. These methods are identified as follows:

1. "Book price"—Under this method, the owner of the timber contracts with the logger to cut the timber for a specific price payable by the owner. The owner is responsible for showing the logger the property lines.

2. "By the ton"—Under this method, the logger agrees to cut the timber and pay the owner a specific price per ton from the sales proceeds received by the logger. The logger is responsible for ascertaining the property lines.

Pounders agreed to "clear cut" the timber and compensate Ford "by the ton."

Apparently, there was no timber deed or written contract executed by the parties. Pounders indicated that Ford told him where his property lines were and made the statement that he owned 20 acres "in the bottom on the other side of the creek." Ford related to Pounders that he owned approximately 64 acres in total, which reasonably comports with Ford's deed description noted hereinabove.

Pounders, in a written statement given to Keith Settlemiers, the investigator for the Theft Division of the Mississippi Department of Agriculture and Commerce, indicated that Ford had come to the property on several occasions, and that when Pounders asked him if he were cutting the right timber, Ford replied "yes." This statement contradicts the "in court" testimony offered by Pounders who stated under oath that, while he was certain that Ford had visited the property during the time that the timber was being cut, he had had no conversations with him. This testimony is consistent with Ford's testimony.

Pounders indicated that he obtained a property map from the Prentiss County Tax Assessor's Office which identified Ford's property. Pounders made no further independent verification of the property lines and never walked the lines with Ford.

One other inconsistency between the statement furnished by Pounders to Settlemiers and his "in court" testimony concerns the property description allegedly furnished to Pounders by Ford. In the written statement, Pounders indicated that Ford told him that he owned all of the bottom that went "to a creek and joined the Natchez Trace." The "in court" testimony was to the effect that Ford told him that he owned 20 acres in the bottom "on the other side of the creek." Having observed the map introduced into evidence

by the plaintiffs, the court certainly perceives a difference in the terminology "to a creek" as compared to "on the other side of the creek." Although Pounders is now "off the hook" insofar as his personal liability to the plaintiffs is concerned, the inconsistencies in his written statement and his oral testimony are significant.

Ford testified that he saw the map that he thought Pounders had obtained from the ASCS Office which reflected the location of his property. He stated that he told Pounders that it did appear to be accurate. He acknowledged that he went to his property on several occasions while the timber was being cut, but he never went further onto the property than the front portion. Consequently, he testified convincingly that he never knew that Pounders was cutting on the Pharr property. He stated that Pounders at one time told him that he had more timber than he had originally estimated, but still he received only $22,000.00 from the timber sales. Ford testified that he was unaware that Pounders' knuckleboom, a piece of equipment utilized for loading harvested timber, was actually situated on the Pharr property. Pounders acknowledged that Ford would had have to have come down onto the property to see the knuckleboom which could not have been seen from the road.

Having observed both Ford and Pounders on the witness stand, the court is much more impressed with Ford's credibility and sincerity, particularly when he testified that he would never have let Pounders cut someone else's timber. Ford stated, somewhat emotionally, that he "was not raised that way." The guileless candor of this comment resonated clearly with the court.

The court could easily conclude that Ford was negligent, perhaps even reckless, in not monitoring more closely where Pounders was cutting the timber. Pounders, on the other hand, was clearly negligent and reckless in not ascertaining the location of the specific property lines, particularly since this was his duty under the cut "by the ton" methodology. From the evidence presented, however, the court cannot conclude that Ford acted with an actual intent to cause injury to the plaintiffs. He did not foster a subjective motive to cause harm, and, because he was unaware that Pounders was cutting timber on the Pharr property, he had no objective substantial certainty of harm. Consequently, Ford's conduct does not constitute a willful and malicious injury to the plaintiffs as contemplated by § 523(a)(6) of the Bankruptcy Code.

V.

At the trial, Ford's attorney indicated that she had filed a motion to avoid the plaintiffs' judicial lien insofar as it impaired Ford's exemption claims. The court advised that this motion would be sustained through the entry of a separate order.

As noted hereinabove, the plaintiffs previously filed a motion seeking relief from the automatic stay which was partially sustained as to Ford's non-exempt real property adjoining the Pharr property. The issue remains as to whether the automatic stay should be lifted as to Ford's exempt property. Consistent with the conclusion reached in this opinion, the court finds that the balance of the relief requested in the motion for relief from the automatic stay is not well taken.

A separate order will be entered dismissing this adversary proceeding, as well as, denying the remaining portions of the motion seeking relief from the automatic stay.