**In re Arlene F. BRINK, Debtor.**

**In re John W. McDonald, Debtor.**

**Dennis Caci, Plaintiff,**

**v.**

**John W. McDonald, Defendant,**

**Dennis Caci, Plaintiff,**

**v.**

**Arlene F. Brink, Defendant.**

Bankruptcy Nos. 03–15543–
JNF, 03–16507–JNF.

Adversary Nos. 03–1406, 03–1407.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 4, 2005.

Daniel Gindes, Marblehead, MA, for Debtor Arlene F. Brink.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are nearly identical Complaints filed by Dennis Caci

("Caci") against John W. McDonald ("McDonald") and Arlene F. Brink ("Brink"), (collectively, the "Debtors"), an unmarried couple who reside with their two children on Upland Road, Winthrop, Massachusetts, next door to Caci. Through his Complaints, Caci seeks a determination that debts in the sum of $102,900 against each Debtor arising out of the unauthorized act of cutting a row of 37 yew trees in May of 1999 are nondischargeable pursuant to 11 U.S.C. § 523(a)(6).[1] The Court conducted a trial at which five witnesses testified and 17 exhibits were submitted in evidence. Additionally, with the consent of all the parties, the Court viewed the adjacent properties belonging to Caci and McDonald located on Upland Road, as well as the property belonging to Gregory DePatto ("DePatto"), whose property is located behind McDonald's property and adjacent to the rear portion of Caci's property. The issues presented are whether collateral estoppel applies as a result of the jury trial and verdict giving rise to Caci's judgment, and whether Caci satisfied his burden of establishing, by a preponderance of the evidence, that both Debtors willfully and maliciously injured his property by the act of cutting down his yew trees.

## II. FACTS

Caci sued the Debtors in the Suffolk Superior Court, Department of the Trial Court and obtained a jury verdict. The jury found that the Debtors had violated Mass. Gen. Laws ch. 242, § 7 which provides the following:

> A person who without license willfully cuts down, carries away, girdles or otherwise destroys trees, timber, wood or underwood on the land of another shall be liable to the owner in tort for three times the amount of the damages assessed therefor; but if it is found that the defendant had good reason to believe that the land on which the trespass was committed was his own or that he was otherwise lawfully authorized to do the acts complained of, he shall be liable for single damages only.

Mass. Gen. Laws ch. 242, § 7. In a Special Jury Verdict, the jury answered four questions as follows:

Q. 1. Did defendant John McDonald wilfully [sic] cut down plaintiff Dennis Caci's trees, shrubs, or other woody growth, or direct another to do so, without the plaintiff's permission?
  A. 1. Yes X____        No____
  (If your answer to Q. 1. Is "YES," please go to Q.2. If your answer to Q.1. is "NO," please go to Q.3.

Q. 2. What is the diminution in value to plaintiff Dennis Caci's property due to defendant John McDonald's cutting of the trees, etc.?
  A. 2. $13,720_____
        (Value in figures)

        Thirteen thousand seven hundred twenty Dollars
        (Value in words)

(Please go to Q. 3.)
Q. 3. What is the diminution in value to plaintiff Dennis Caci's property due to defendant Arlene Brink's cutting of the trees, etc.
  A. 3. $20,580_____

---

1. Caci obtained a judgment in the amount of $34,300 against the Debtors jointly and severally and in the amount of $68,600 against each of the Debtors severally.

(Value in figures)

Twenty thousand five hundred eighty Dollars
(Value in words)

(Please go to Q. 4)
Q.   4   Did defendant Arlene Brink have good reason to believe that she was lawfully authorized to do the cutting by Christine Caci?
A.   4.   Yes _____          No _X_

Following the Special Jury Verdict, the Superior Court, on June 21, 2002, entered a judgment against McDonald in the sum of $41,160 and against Brink in the sum of $61,740. Four days later, on July 25, 2002, the Superior Court entered an Amended Judgment against McDonald and Brink, jointly and severally, in the sum of $34,300 (the total of $13,720 and $20,580). It also entered a judgment against McDonald, severally, in the sum of $68,600; and against Brink, severally, in the sum of $68,600. It also increased the amount of an attachment against the real property owned by McDonald to $103,000. In its Amended Judgment, which was entered as a result of a Motion to Amend Judgment, the state court referred to its Memorandum of Decision and Order. The Memorandum of Decision and Order was not submitted into evidence at trial.

Brink filed a voluntary Chapter 7 petition on June 30, 2003, less than a year after the entry of the Amended Judgment. On her Schedules, she listed personal property with a value of $9,150 and unsecured claims totaling $114,495 consisting of credit card debt and Caci's judgment in the sum of $103,000. She also listed her children, John W. McDonald, IV and Margaret A. McDonald, ages three and four, respectively, as dependents. She reported no excess income. The Trustee filed a Report of No Distribution on August 12, 2003, and Brink received a discharge on February 9, 2004.

McDonald filed a voluntary Chapter 7 on August 4, 2003. On Schedule A–Real Property, he listed his ownership interest in the residence he shares with Brink located at 87 Upland Road, Winthrop, which he claimed exempt pursuant to Mass. Gen. Laws ch. 188, § 1. He valued the property, a two-family residence, at $485,000, subject to a mortgage in the sum of $272,750. He also listed personal property with a value of $10,750, and unsecured debt of $179,525, which included Caci's judgment. On Schedules I and J, he listed his two children as dependents and further disclosed that he had no excess income, despite income from his employment with the United States Coast Guard, military disability payments and the rental payments from the first floor of his two-family home. McDonald received a discharge on February 9, 2004, the same day as Brink. The Trustee filed a Report of No Distribution approximately five months later.

At the trial, Caci and his daughter, Christine Sheehan ("Sheehan") testified, as well McDonald and Brink. Additionally, their neighbor, DePatto, testified. The testimony of the witnesses, particularly the testimony of Brink and Sheehan was inconsistent, thus requiring the Court to assess their credibility.

The judgment obtained by Caci relates to a row of 37 yews which form a boundary between his property and McDonald's property. Before Brink cut down the yews in May of 1999, the yews were approximately 20 feet tall and formed a dense hedge separating the properties. At the present time, the yews range in height

from four to six feet tall. Some of them are more bushy than they were in early 1999, and, particularly near Upland Road, they are intermingled with over grown brush, rosa rugosa, and other plants and weeds. In addition to the yews, a retaining wall and a fence separate the adjacent parcels. Both DePatto's property and McDonald's property are well maintained, containing a variety of trees, shrubs and flowers. Caci's property, on the other hand, is unkempt and overgrown with trees, weeds, and other vegetation which obscure his view of the ocean.

Caci's parcel is the larger of the two adjacent parcels and slopes eastward to the Atlantic Ocean. DePatto's property abuts McDonald's property in the rear and includes ocean frontage. Because the McDonald and Caci properties are on the eastern side of Upland Road, facing the Atlantic Ocean, prior to May of 1999, the row of yews blocked sunlight into McDonald's yard, which he and Brink were improving for the benefit of their young children. In 1998, McDonald removed several trees from his backyard, and, according to DePatto, he cut down a maple tree on DePatto's property as well, an allegation McDonald disputed.

Prior to May of 1999, either McDonald or Brink removed branches from the yew trees that were overhanging McDonald's property. Photographs submitted into evidence depict the yew hedge from Mc-Donald's side of the property line. They show unsightly limbs, bare of growth at the bottom, following that cutting.

Sheehan testified that Brink approached her on a Sunday afternoon in the Spring of 1998 about "pruning" the yew trees. Sheehan testified as follows:

[S]he [Brink] said, "Well, you know, I was talking, you know, and I was talking about trimming the trees and the overhang," and I said—I said, "You know what, Arlene, I apologize, I know my father hasn't been here, he's the—you know, he's the owner, he doesn't want Tim [Sheehan's boyfriend and now husband] and I touching it," and I said, "I apologize because I know that the yard is a bit overgrown. So if you need to trim overhang on your side, then, you know, certainly do what you need to do," and—and she was like just very friendly, you know, "Okay," and that was the extent of it.[2]

According to Brink, her conversation with Sheehan was more extensive. Brink indicated that the Caci property was "pretty unkempt" and "we wanted to put a fence up and be able to you know, reclaim our space over there."

Brink testified that she invited Sheehan into her home and gave her a book titled *Shrubs & Hedges* containing sections captioned "Solving Hedge Problems" and "Revitalizing Old Shrubs."[3] She also gave

---

**2.** It would appear that Sheehan was unaware that either Brink or McDonald already had trimmed the branches that were overhanging on their side of the property line.

**3.** The book contained the following information:

Many older shrubs act like small trees, growing to heights never mentioned in catalogs and gardening books. Mature specimens can be the focal point of an entire landscape, especially if the foliage and branches that conceal the trunk are trimmed away. . . .

If the top part of a shrub is unattractive, cut the shrub completely to the ground. As long as the plant has the strength to push out new shoots and leaves, it will have enough strength to replace what was cut off. By cutting off the shrub as close to the ground as possible, new growth will be generated from the roots rather than from older branches. The best time to prune severely is late winter or early spring.

Sheehan the telephone number she shared with McDonald, advising her to call if she had questions. Brink stated that Sheehan told her that "the property is [sic] totally her decision making." Brink also asked Sheehan if she "could prune them [the yews] down evenly to about the ground level because they, after we trimmed the sides of them down, they looked, I will say they looked pretty bad you know, even then, it was no improvement at all. So I just wanted to come up with another way to make the property a little better."

Brink further testified that she told Sheehan that the bushes would grow back "very nicely," but she admitted that she did not discuss with her the length of time it would take for the shrubs to grow back. She told Sheehan that she intended to cut the yews "toward the end of the week, never really knowing which day I would do it the end the week, whether it would be Thursday or Friday."

According to Sheehan she returned home from work on Thursday, May 6, 1999 around 5:20 p.m. Intending to go the gym, she changed clothes in about ten minutes and headed toward Winthrop Center, where she exercised. When she returned from the gym in about an hour, she discovered the yews were gone. She stated:

I pulled into the driveway and I was just in shock. All the trees were laying down just on the ground and no one was in sight. I ran out in the back yard and—neither Arlene or John were around. I was looking for someone, and it was like, just—no one was available, no one was there. So I immediately—I ran upstairs, I was upset, I was—I was crying. I knew what these trees meant to my father, I know what the property

means to my father, and so I immediately called my mother first, and she was just trying to calm me down. . . .

Sheehan also testified about the loss of privacy occasioned by the absence of the trees and the increase in the level of noise she could hear from McDonald's property.

Brink's testimony was at odds with Sheehan's. She stated that she cut the trees when her daughter was taking a nap around 10:00 in the morning while McDonald was at work. According to Brink, McDonald usually left for work at 5:30 in the morning and returned home about 3:30 in the afternoon. She indicated that she used a chainsaw, and pictures submitted in evidence show that she cut the yews down to the stumps. She testified it took her about two hours to complete the job. She further testified that she did not have any specific conversations with McDonald about cutting down the yews although they did discuss "that I was going to do some work over there." McDonald echoed her testimony, stating: "I didn't know she was going to cut them prior to the cutting." He admitted having discussions with her about the property, however. He testified:

Well . . . it was pretty unkempt. Those particular yews were growing way over the property line into our face. When you went down the line along that wall with lawnmower you had to duck down significantly to get under these things, and you know, they were definitely encroaching significantly on our property.

DePatto, referring to the instance when either McDonald or Brink cut the yew hedge in half vertically to remove branches overhanging into their yard, testified that in the summer of 1998, he went up to

---

Treat the resulting new growth like that of a new shrub.
Some shrubs can be killed by cutting them back too far. . . .

Brink testified that she did not read these sections to Sheehan.

McDonald and said "You really butchered those—those trees." He also recounted his recollection of a conversation with McDonald in which McDonald stated that an ice storm could take care of the yews, intimating that McDonald would have liked to have seen the trees removed in one fashion or another. In May of 1999, DePatto had another conversation with McDonald after the trees were cut. He testified that he confronted McDonald about the trees, and McDonald replied that Brink, not he, cut the yews down.[4]

Caci, who was not living on Upland Road in May of 1999, testified that his brother planted the row of yews and that they had not been touched for approximately 20 years. He further testified that he went to the property on Monday, May 10, 1999, and saw the yews piled up against the side of his house. He called McDonald and angrily demanded their removal. He testified that the yews were gone the next day, and sometime later, McDonald and Brink put up a stockade fence between his property and theirs.

Caci testified unequivocally that neither McDonald nor Brink asked his permission to cut down the yew trees and that he did not give permission to either McDonald or Brink to cut down the row of yew trees. There was no evidence that Caci authorized Sheehan to manage the property for him or that he authorized her to make decisions about its upkeep.

The Court finds that Sheehan's testimony that her father would have to determine whether the yews could be pruned was more credible than Brink's testimony, particularly as Brink admitted that she did not fully disclose her intention to cut the yews down to their stumps. Although

Caci's property was unkempt at the time Brink cut the yew hedge and remains so today, neither Brink nor McDonald were authorized to cut the yews and, as the jury found, Brink had no good reason to believe she was authorized to do what she did.

The Court further finds that McDonald and Brink were motivated to completely cut down the yew hedge for several reasons: to remove the eyesore created by the removal of branches that were hanging into their yard, to increase the amount of light in their backyard, to improve the visual quality of their landscape, and to facilitate the construction of a fence between the two properties.

## III. DISCUSSION

### A. *Applicable Law*

1. 11 U.S.C. § 523(a)(6)

■ Section 523(a)(6) of the Bankruptcy Code excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." In *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the United States Supreme Court concluded that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* It added:

Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." More-

---

4. DePatto also testified that he saw McDonald routinely doing heavy work in his yard despite his disability. Additionally, DePatto testified that McDonald removed a number of trees from his property. McDonald dismissed DePatto's testimony, suggesting that DePatto bore a grudge against him because he refused to sell him a portion of his property.

over, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act*," not simply "the *act itself.*"

*Id.* at 61–62, 118 S.Ct. 974 (citing Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)) (emphasis in original).

■ In *Gomes v. Limieux (In re Limieux),* 306 B.R. 433 (Bankr.D.Mass.2004), the bankruptcy court observed that "[w]hile *Geiger* defined 'willful' under § 523(a)(6) at length, arguably, it did not provide discrete illumination for 'malicious,' the second modifier of injury in the section." *Id.* at 439 (citing *McAlister v. Slosberg (In re Slosberg),* 225 B.R. 9, 16 (Bankr.D.Maine 1998), and *Read & Lundy, Inc. v. Brier (In re Brier),* 274 B.R. 37, 43 (Bankr.D.Mass.2002)). The court in *Limieux* agreed with the court in *Slosberg* that more than a showing of either intent to injure or proof of the actor's substantial certainty of the injurious outcome is required under § 523(a)(6). "[T]here must be proof of the debtor's malice." *Limieux,* 306 B.R. at 440; *Slosberg,* 225 B.R. at 19–20. It concluded that " 'malice' under § 523(a)(6) requires 'a showing that the debtor's wilful, injurious conduct was undertaken without just cause or excuse.' " *Id.* (quoting *Slosberg,* 225 B.R. at 21). Thus, according to the court in *Limieux,* "this formulation leaves intact that portion of the First Circuit's *Printy* decision defin-

ing 'malice,' and it provides a meaningful standard for removing from § 523(a)(6)'s exception to discharge those injurious acts of the debtor done for reasons that justify or excuse the act.' " *Id.* (citing *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir.1997)).

■ For purposes of this decision, the Court shall accept the formulation of applicable law set forth above. To establish the nondischargeability of a debt under § 523(a)(6), the creditor must prove by a preponderance of the evidence, *see Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), that "1) the injuries complained of were the result of an act of the debtor done without justification or excuse; and 2) the debtor acted either intending to cause an injury or with substantial certainty that the injury would occur." *Limieux,* 306 B.R. at 440. *But see Pharr v. Ford (In re Ford),* 276 B.R. 561 (Bankr.N.D.Miss.2001).[5]

### 2. Collateral Estoppel

The bankruptcy court in *Limieux* also considered the doctrine of collateral estoppel or issue preclusion in the context of a complaint in which the dischargeability of a debt was in issue. Noting that "[u]nder the Full Faith and Credit Act, 28.U.S.C. § 1738, the preclusive effect of a state court judgment in a subsequent federal court proceeding is determined by the preclusion law of the state in which the judgment issued," 306 B.R. at 438, it summarized the requirements for application of the doctrine in Massachusetts as follows:

---

5. In *Ford,* the court stated the following:
    "The 'just cause or excuse' approach is peculiarly inappropriate, however, given the Supreme Court's definition of 'willful ... injury' in *Kawaauhau.* Where injury is intentional, as it now must be under *Kawaauhau,* it cannot be justified or excused. Eliminating the 'just cause or excuse' exception would not ensnare those who have

    acted under 'an honest, but mistaken belief.' Such an individual cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of 'not substantially certain to result,' in the absence of the fact about which there has been mistake."
    *Id.* at 565.

Four elements must obtain to invoke issue preclusion: 1) a final judgment on the merits issued in the prior action; 2) the issue for which preclusion is sought was actually litigated and essential to the judgment in the prior action; 3) the party against whom preclusion is sought was a party (or in privity to a party) in the prior action; and 4) the issue for which preclusion is sought is the same in both the prior and present actions.

*Id.* at 438–39 (citing *TLT Constr. Corp. v. A. Anthony Tappe & Assocs., Inc.,* 48 Mass.App.Ct. 1, 5, 716 N.E.2d 1044, 1050 (1999)).

3. Vicarious Liability under § 523(a)(6)

In *Columbia Farms Distrib., Inc. v. Maltais (In re Maltais),* 202 B.R. 807 (Bankr.D.Mass.1996), the court summarized the applicable law. It stated:

Section 523(a)(6) expressly provides that dischargeability of a debt will be precluded in the event that it arises from willful and malicious injury "by the debtor." In *Miller,* [*Deroche v. Miller (In re Miller),* 196 B.R. 334 (Bankr. E.D.La.1996)] after noting the presence of the phrase "by the debtor" in the statute, Judge Brown stated: "Thus, the plain meaning test requires that the debtor must have been the one who caused the willful and malicious injury. Imputed liability is insufficient." 196

B.R. at 336. Further, in this District, Judge Queenan has agreed that the acts of another cannot be imputed to the debtor for the purposes of § 523(a)(6), commenting:

[A] judgment against a debtor based on acts of an agent is not within the meaning of the exception to discharge of a debt for willful and malicious conduct. Section 523 of the Code, as a whole, is aimed at individual conduct of the debtor deemed so socially reprehensible as to be unworthy of a discharge in bankruptcy. This is made clear by the wording of the statute itself, which requires that the action at issue be "by the debtor." Therefore, a judgment based on actions for which the debtor may be legally responsible but which were not performed by the debtor is outside the scope of both the language and intent of the statute.

*Bairstow v. Sullivan (In re Sullivan),* 198 B.R. 417, 418–19 [sic] [423] (Bankr. D.Mass.1996); *see also Piccicuto v. Rex (In re Rex),* 150 B.R. 505, 506 (Bankr. D.Mass.1993), *rev'd on other grounds sub nom. Piccicuto v. Dwyer,* 39 F.3d 37 (1st Cir.1994).

*In re Maltais,* 202 B.R. at 811.[6]

The bankruptcy court in *Sullivan,* while articulating the general proposition that

---

6. The bankruptcy court added:

Most other courts addressing the issue have followed this reasoning. However, two published decisions have held contrary to *Miller* and *Sullivan. Impulsora Del Territorio Sur v. Cecchini (In re Cecchini),* 780 F.2d 1440 (9th Cir.1986); *Oetker v. Bullington (In re Bullington),* 167 B.R. 157 (Bankr. W.D.Mo.1994). In *Cecchini,* the Court of Appeals for the Ninth Circuit imputed the knowledge and intent of the blameworthy partner to the innocent debtor-partner, relying on "basic partnership law." 780 F.2d at 1444. The court cited as authority a

Supreme Court case, *McIntyre v. Kavanaugh,* 242 U.S. 138, 139, 37 S.Ct. 38, 39, 61 L.Ed. 205 (1916), which involved § 17(2) of the Bankruptcy Act of 1898, the predecessor of § 523(a)(6). The reasoning of the Bankruptcy Court for the Western District of Missouri in Bullington mirrored that of the Ninth Circuit in *Cecchini.* 167 B.R. at 163.

This Court is unpersuaded by the reasoning of these two cases. Reliance on partnership law principles of vicarious liability ignores the explicit plain meaning of the statute, i.e., that the misconduct must be

willful and malicious conduct on the part of agents cannot be imputed to the debtor, nevertheless, determined that the debtor was not entitled to discharge a debt arising out of a judgment under Mass. Gen. Laws ch. 242, § 7 even though he did not personally cut down trees on someone else's property.

In *Sullivan,* as in this case, the plaintiffs sought to except a debt arising from a judgment under Mass Gen. Laws ch. 242, § 7 from discharge pursuant to 11 U.S.C. § 523(a)(6). In answer to special questions, the jury in the Superior Court answered the following questions in the affirmative: "1. Did the [Debtor], his agents, employees or anyone at his direction trespass upon the property of the plaintiffs? 2(A). Did the [Debtor], his agents, employees or anyone at his direction without license willfully cut down ... trees, timber, wood or underwood on the land of the plaintiffs?" 198 B.R. at 418. Because the jury answered these questions in the affir-

mative, it proceeded to question 2(B), determining that the debtor had no "good reason to believe that the land on which the trespass was committed was his own or that he [or they] were otherwise lawfully authorized to do the acts complained of?" *Id.* Unlike the instant case, there was a separate trial on the issue of damages, which the state court tripled.

In *Sullivan,* Judge Queenan found that the trespass by the debtors's agents was incidental to construction on the debtor's property, which took place over several months. *Id.* at 418–19. The debtor did not perform any of the work in question; rather his brother supervised the project, including removing trees, which the plaintiffs questioned immediately. *Id.* at 419. Judge Queenan determined the state court judgment against the debtor was nondischargeable. He stated:

> In sum, a finding of "willful and malicious conduct" necessitates an inquiry by the court, not into the debtor's moti-

> performed "by the debtor." While vicarious liability principles were the basis for the Supreme Court's holding in *McIntyre,* the statute involved there did not provide that the willful and malicious injury must be caused "by the debtor." *See McIntyre,* 242 U.S. at 139, 37 S.Ct. at 39 (as originally enacted, § 17(2) of the 1898 Bankruptcy Act provided: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except ... judgments in actions for ... willful and malicious injuries to the person or property of another"). Finally, it is noteworthy that nineteen months after it decided *Cecchini,* the Ninth Circuit suggested that it had some reservations about that decision. In *La Trattoria, Inc. v. Lansford (In re Lansford),* 822 F.2d 902 (9th Cir.1987), the court stated:
>> In *In re Cecchini,* ... this court cited basic partnership law to hold that a business partner's debt was non-dischargeable because he had "participated in the benefits" of his partner's misconduct, which had been undertaken on behalf of the partnership and in the ordinary course of business.... Were we to rely

>> on strict agency or partnership principles, we might be forced to conclude that Cecily Lansford's debt is non-dischargeable regardless of her knowledge of the fraud or her own culpability. In light of the [B]ankruptcy [C]ode's purpose of providing a fresh start ... and the decisions of other circuits refusing to apply agency principles absent some culpability on the part of the party to be charged, ... we believe the breadth of the proposition stated in *Cecchini* deserves more thorough consideration before its application to the circumstances presented in this case.
> 822 F.2d at 904–05 (citations omitted). This Court agrees with the concern raised by the *Lansford* decision. The imputation of the acts of a third party to deny the dischargeability of a debt appears to this Court to be inconsistent with its twin mandates to provide a fresh start to the honest debtor and to do equity within the confines of the Bankruptcy Code.
> *In re Maltais,* 202 B.R. at 811–12 (footnotes omitted).

vation, but into the degree of immorality of the debtor's conduct. After making this inquiry, I hold the debtor's conduct in this case was willful and malicious within the meaning of section 523(a)(6). It was proven at the trial that agents, employees or those under the direction and control of the debtor had intentionally and deliberately trespassed upon land of the Plaintiffs and damaged their property. The conduct also contained aggravating features making it malicious. The trespass and injurious activities continued for several months after it was brought to the attention of the Debtor's workcrew a trespass existed. I therefore conclude the conduct was willful and malicious within the meaning of section 523(a)(6), and hence nondischargeable.

*Id.* at 423 (footnote omitted).

Following this conclusion, the bankruptcy court examined whether the fact that the debtor's workcrew and not the debtor trespassed on the plaintiff's property precluded judgment in the plaintiff's favor. Relying upon principles of collateral estoppel, Judge Queenan determined:

[T]he jury found the Debtor had no good reason to believe the Plaintiffs' land was his or that he was authorized to do the complained of acts. It is clear from this answer that the evidence convinced the jury the Debtor knew his workcrew was on land which was not his and that he had no authority for the crew's removal of the trees and other items from the land. Debts based on vicarious liability are not excepted from discharge because they are not based on deliberate and or intentional conduct by the liable party. In contrast, the jury here found the Debtor knew this continuing trespass was being committed but did nothing about it. That is deliberate and intentional conduct within the scope of section

523(a)(6). Therefore, the established law regarding vicarious liability does not aid the Debtor.

*Id.* at 424 (footnote omitted). The court next considered whether the plaintiffs could rely on the answer to special question 2(B). The court rejected the debtor's argument that Mass. Gen. Laws ch. 242, § 7 shifted the burden to him of proving his good faith belief of his ownership or authorization and entered a judgment against the debtor on the § 523(a)(6) count of the complaint. *See also Glazer v. Alley (In re Glazer),* 25 B.R. 329 (9th Cir. BAP 1982)(debt arising willful and malicious injury was excepted from discharge where debtor trespassed on neighbor's property and cut back part of tree); and *Hines v. Tanner (In re Tanner),* 17 B.R. 201 (Bankr.W.D.Ky.1982)(debtor's act in cutting and removing 25 trees from neighbor's property was willful and malicious). *But see Pharr v. Ford (In re Ford),* 276 B.R. 561 (Bankr.N.D.Miss.2001)(judgment debt of contractor who harvested timber from tract belonging to neighbor not excepted from discharge).

## B. *Discussion*

■ The first issue the Court must decide is whether collateral estoppel applies. The Superior Court jury determined that McDonald acted willfully in cutting down Caci's trees or directing Brink to do so, and that Brink had no good reason to believe she was authorized to cut down the trees. These two findings were incorporated in a final judgment which entered after a trial on the merits. The Court finds that the jury's answers to the special questions posed to it, the amended judgment entered against the Debtors in the state court, as well as this Court's assessment of the credibility of the witnesses who testified at trial in this proceeding, establish 1) that McDonald and Brink acted in concert; 2) that McDonald and Brink

intended to cut down Caci's trees; and 3) that McDonald and Brink acted without just cause or excuse. The answers to the special questions establish that the jury was convinced that McDonald and Brink knew that they did not have permission to remove the yews and that when Brink did so she was trespassing on Caci's property. The question remains as to whether the Debtors intended to injure Caci's property.

Based upon the evidence presented, the Court finds that the Debtors intended to injure Caci's trees and Brink's conduct in cutting down the hedge row between the McDonald and Caci properties, which conduct McDonald knew about and supported, was willful and malicious within the meaning of § 523(a)(6). The credible evidence and principles of collateral estoppel preclude McDonald and Brink from challenging the jury's finding that they acted in concert, and they establish that they are both liable for the willful and malicious injury to Caci's property. The Court rejects McDonald's testimony that he was unaware of Brink's plans to cut the yew hedge to the ground as incredible. Both McDonald and Brink embarked on a plan to improve their backyard for the benefit of their young children. Moreover, Brink advised Sheehan to call McDonald with questions. Thus, the Court concludes that both Debtors acted with an intent to cause injury to Caci's property and that they acted without just cause or excuse having failed to obtain the permission from Caci to enter upon his property.

Brink's perception, even if believed, that cutting the trees to the ground would improve them is irrelevant. The trees belonged to Caci and were on his property. Brink was not authorized to cut them to the ground and in so doing she and McDonald willfully and maliciously destroyed the hedgerow between the two properties.

In short, the Court finds that Judge Queenan's decision in *Sullivan,* a case with a remarkably similar fact pattern, is persuasive. Accordingly, this Court shall follow its reasoning.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of Caci and against each of the Debtors.