**ITOFCA, INCORPORATED,
Plaintiff–Appellant,**

v.

**David HELLHAKE, Defendant–Appellee.**

**No. 92–4065.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1993.

Decided Nov. 3, 1993.

Richard M. Kates, Chicago, IL (argued), for plaintiff-appellant.

Robert A. Downing (argued), Gloria R. Mitka, Steve F. Katz, Sidley & Austin, Chicago, IL, for defendant-appellee.

Before BAUER and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Itofca, Inc. ("Itofca" or "plaintiff") brought suit against David Hellhake ("Hellhake" or "defendant") alleging that he tortiously interfered with a lease between Itofca and Tymnet, Inc. ("Tymnet"). Hellhake, then Presi-

---

4. Judge Cudahy would not invoke Circuit Rule 36.

dent of Itofca Realty,[1] negotiated the terms of an agreement that terminated the lease one and a half years before its scheduled expiration. The defendant, Hellhake, alleged that he was acting in his capacity as a corporate officer and at the direction of corporate superiors when he terminated the lease. Itofca claimed that Hellhake participated in the alleged tort and thus could be personally liable for his conduct. The district court found that Itofca failed to present sufficient evidence to raise a genuine question of fact regarding whether Hellhake was so personally involved in the alleged tortious activity that he could be found personally liable. Therefore, the court entered summary judgement in favor of the defendant.

## I.

### Background

Itofca leased office space to Tymnet in a building located in Downers Grove, Illinois. McDonnell Douglas Corporation later assumed Tymnet's obligations under that lease. The obligation to pay rent for the premises was to run until May 31, 1992.

For at least some portion of the time in which the lease was in effect, Itofca was operating through a subsidiary, Itofca Consolidators, Inc. Early in 1990, however, Itofca severed this parent-subsidiary relationship by selling Itofca Consolidators to Trade & Transportation Trust ("TTT"). Later in that year, TTT sold Itofca Consolidators to The Itofca Group.

Itofca Consolidators was a sister corporation to Itofca Realty. At the time of the lease cancellation in question, both compa-

nies were owned by The Itofca Group. In October of 1990, the Caravel Holding Corporation ("Caravel") purchased The Itofca Group. Hellhake was, at all times relevant to this case, the President of Itofca Realty.

Late in 1990, an agent of McDonnell Douglas contacted Hellhake to discuss the possibility of terminating the lease prior to its scheduled expiration.[2] Hellhake claimed that Leonard Pelullo, Chairman and majority shareholder of Caravel, directed him to terminate the lease. Before taking any action, Hellhake performed a due diligence inquiry to determine if he had the authority to cancel the lease. He was the only person who had any contact with McDonnell Douglas' agent. He personally negotiated and executed a termination of the Tymnet lease on December 21, 1990, with an effective date of November 30, 1990, 18 months prior to the expected end of the lease.

On April 5, 1991 Itofca filed its amended complaint [3] against Hellhake alleging that he tortiously interfered with an otherwise valid lease between Itofca and Tymnet/McDonnell Douglas. Itofca sought recovery in the amount of $216,000, representing the amount of rent it would have collected had the lease remained in effect until its scheduled termination. The defendant moved for summary judgement on the grounds that he was acting in his capacity as a subordinate corporate officer and could not be personally liable.[4] The district court found that Itofca failed to present sufficient evidence to raise a genuine issue of fact concerning whether Hellhake was involved to such an extent that he could be personally liable. Therefore, they granted defendant's Motion.

---

1. The facts of this case concern a number of separate but related companies, all involved in a web of corporate structural changes. These companies are: Itofca, Inc., Itofca Realty, Itofca Consolidators, The Itofca Group, Trade and Transportation Trust, and Caravel Holding Corporation. Each of these will be discussed in the remainder of the opinion.

2. The person who actually contacted Hellhake was Robert Stehlik, who was the President of Avastar Corporation. He had the authority to terminate the lease on behalf of McDonnell Douglas and Tymnet.

3. Itofca filed its original complaint on February 15, 1992. The district court, however, dismissed

it for lack of subject matter jurisdiction and allowed the plaintiff leave to file an amended complaint.

4. The defendant also argued that Itofca Realty, not Itofca, had the authority to cancel the lease, therefore, the termination could not have been wrongful. The district court did not reach this issue because it concluded that regardless of which company had authority, Hellhake could not be personally liable. This court addresses only the issue of Hellhake's personal involvement and liability and not whether Itofca Realty itself had authority to terminate the lease.

## II.

### Analysis

██ This appeal arises out of an order granting summary judgement in favor of the defendant, David Hellhake. When examining a grant of summary judgement, we review both the record and the controlling law de novo. *PPG Indus. v. Russell*, 887 F.2d 820, 823 (7th Cir.1989). To prevail on a motion for summary judgement the movant must demonstrate that there are no genuine questions of fact, *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and that he is entitled to judgement as a matter of law. Fed.R.Civ.P. 56(c).

The defendant filed a motion for summary judgement on two counts. First he alleged that Itofca Realty was the company that had control over the building in question and was the party entitled to receive the rents from Tymnet/McDonnell Douglas. Based on this, Hellhake argues that he had a right to cancel the lease, and thus the termination was not wrongful. His second argument is that he was acting solely in his capacity as an officer of Itofca Realty and upon instructions from the parent corporation. Therefore, he contends, the only cause of action lies, if at all, against the corporation.[5] We conclude that although there are no questions of fact regarding Hellhake's involvement, he is not entitled to judgement as a matter of law on the second claim. We do not reach the issue of what entity, if any, actually had the authority to terminate the lease; rather, that issue is for the district court to determine upon remand.

5. Itofca Realty and most other related Itofca entities, excluding Itofca, Inc., are currently involved in bankruptcy proceedings.

6. This has been the rule of law in Illinois for over sixty years. See *Simon v. Pelouze*, 263 Ill.App. 177, 183–84 (1st Dist.1931) (holding that officers and directors are not liable for torts "unless [they] participated in such [tortious acts]"). See also, *Independence Tube Corp. v. Copperweld Corp.*, 74 F.R.D. 462, 467 (N.D.Ill.1977) ("[I]t is the law in Illinois ... that a corporate officer or director may be held jointly and severally liable ... if he authorized or participated in the alleged wrongful act.").

### A. Corporate Officers' Personal Liability for Torts.

██ The general rule of law in Illinois is that a corporation as an entity is separate from its officers, shareholders and directors "who are not ... liable for the corporation's obligations." *Gallagher v. Reconco Builders, Inc.*, 91 Ill.App.3d 999, 1004, 47 Ill.Dec. 555, 558, 415 N.E.2d 560, 563 (1st Dist.1980). This rule standing alone would provide a shield for Hellhake to protect him from personal liability. In this case, however, Itofca seeks to hold Mr. Hellhake liable specifically for an alleged tort. In Illinois, corporate officers are liable for torts if they **"participated** in the conduct giving rise to that liability." *Prince v. Zazove*, 959 F.2d 1395, 1401 (7th Cir.1992) (emphasis added).[6] Itofca points to this principle as forming a basis for the imposition of liability on Mr. Hellhake because he was an officer of Itofca Realty [7] and he negotiated and executed the lease termination.[8]

██ The defendant argues that there is a heightened level of participation required before a corporate officer will be liable for alleged torts. In this regard, the defendant misinterprets the law in Illinois. In his brief, Hellhake claims that "in the context of corporate officer liability, participation means active participation, not simply carrying out the orders of a corporate superior." (Appellee's Brief at 11). His argument essentially is twofold; he cannot be held liable because 1) the courts require a showing of "active" participation, and 2) merely following orders does not constitute active participation. We reject his argument in both respects.

7. We note that the rule of law expressed above applies only to corporate officers and directors. We therefore express no opinion regarding the level of involvement required to impose liability upon ordinary employees or others associated with the corporation.

8. The fact the Hellhake executed the agreement as President of Itofca Realty is irrelevant to this appeal. The law in Illinois states that an officer of a corporation may be liable in tort if he participated, even if he was acting for the corporation at the time. *Miller v. Simon*, 100 Ill. App.2d 6, 10, 241 N.E.2d 697, 700 (1st Dist. 1968).

### 1. Active participation is not the standard

Hellhake directs us to one Illinois case that requires **"active** participation" in order to find corporate officers liable for their torts. (See *National Acceptance Co. of America v. Pintura Corp.*, 94 Ill.App.3d 703, 707, 50 Ill.Dec. 120, 123, 418 N.E.2d 1114, 1117 (2nd Dist.1981). For two reasons, *Pintura* does nothing to clarify the issue in this case. First, it is but one isolated, appellate holding that casually adds an extra word to the rule of law that has been clear for over sixty years. We must assume that if the Second District, by its use of the word *active*, had wished to require a greater level of involvement it would have explained how its holding differed from the long line of previous cases. It did not do this.

Furthermore, even if we were to adopt the language of *Pintura,* we see no practical or meaningful difference between the terms "participation" and "active participation." "Participation in the conduct giving rise to [the] liability," in the context of a tort, always implies and requires some degree of activity and active involvement.[9] Therefore, Hellhake's reference to this language does not add anything to his claim that he is entitled to judgement as a matter of law. He may be held liable if he participated in the alleged tort.

### 2. Following orders is not a valid defense

■ Hellhake also contends that an officer cannot be held liable if he "simply carry[s] out the orders of a corporate superior." (Appellee's Brief at 11). In essence he asks this court to find that "following orders" is an affirmative defense to tort liability. He offers no case, and this court is aware of no case, that supports this position. A corporate officer or director may not seek shelter from tort liability in the widely-discredited

defense that he was "only following orders."[10]

### B. Hellhake's Involvement in the Lease Cancellation.

■ After concluding that participation in the conduct giving rise to the tort is a sufficient basis for the liability of a corporate officer, we next consider whether Hellhake's actions and involvement meet this standard. In late 1990, Hellhake, then President of Itofca Realty, was contacted by Robert Stehlik, who was the President of Avastar Corp., and who had authority to act on behalf of McDonnell Douglas. Mr. Stehlik indicated that McDonnell Douglas was interested in terminating the Tymnet lease. Hellhake stated in his affidavit that shortly after this, Leonard Pelullo instructed him to terminate the lease. After receiving that direction, Hellhake independently conducted a "due diligence" fact-finding search to determine if he had the authority to act in this way. Only after he had satisfied himself of this authority did he begin negotiations with Stehlik.

At all times, Hellhake was the one and only representative of the Itofca companies who had any contact with Stehlik, and the only person involved in the lease termination. Hellhake personally negotiated each term of the agreement without further consultation with his alleged superior, Leonard Pelullo. At the end of the negotiations, Hellhake and Stehlik executed the agreement to terminate the lease (18 months prior to its scheduled expiration). The agreement provided that Avastar Corp., acting on behalf of McDonnell Douglas, would pay a $120,000 premium for the privilege of an early termination. Hellhake and Stehlik agreed on which bank account was to be the repository for this money. After the parties executed the agreement, McDonnell Douglas ceased paying rent. The undisputed facts clearly demonstrate that Hellhake has, as a matter of law, participated in the lease cancellation.

---

9. Thus, this opinion does not foreclose the possibility that some people, although they may have a hand in the conduct, perform tasks that are so ministerial they cannot be held to have participated in the tort. This, however, is not one of those cases.

10. Because, on these facts, we find no validity in this defense, we do not address any issue relating to an alleged agency relationship between Hellhake and Pelullo, or the authority of Pelullo to direct Hellhake's actions.

## III.

### Conclusion

Based on this uncontroverted evidence, there is no question of fact regarding the level of Hellhake's involvement. The law is clear that he can be held personally liable if he participated in the conduct giving rise to the liability. We hold that as a matter of law, Hellhake has participated in the lease cancellation and is a proper defendant in this case. We do not address the ultimate issue of whether the cancellation was wrongful as against the plaintiff (i.e. whether Hellhake or his company actually had the authority to terminate the lease), or whether the elements of tortious interference with contract have been established. We leave these questions for the district court. Therefore we REVERSE the district court's grant of defendant's summary judgement motion and REMAND the case for further proceedings consistent with this opinion.