**FILED**
**U.S. Bankruptcy Appellate Panel**
**of the Tenth Circuit**

**August 9, 2018**

**Blaine F. Bates**
**Clerk**

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE TENTH CIRCUIT**

---

IN RE ASHLESHA NIGAM,

    Debtor.

BAP No.    CO-17-044
CO-17-045

---

PATRICIA COCOMA and CUSCO JACKS, INC.,

    Plaintiffs – Appellants,

v.

ASHLESHA NIGAM,

    Defendant – Appellee.

Bankr. No. 14-21517
Adv. No. 14-1574
Chapter 7

OPINION*

---

Appeal from the United States Bankruptcy Court
for the District of Colorado

---

Before **CORNISH**, **JACOBVITZ**, and **HALL**, Bankruptcy Judges.

**HALL**, Bankruptcy Judge.

    Appellants Patricia Cocoma and Cusco Jacks, Inc. ("Ms. Cocoma" and "Cusco Jacks," or together, "Appellants") appeal the bankruptcy court's *Order Dismissing Complaint*[1] and *Judgment*[2] denying Appellants' claims for

---

\*    This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion. 10th Cir. BAP L.R. 8026-6.

[1]    Appellants' App. at 601.

[2]    Appellants' App. at 617.

nondischargeability of debts pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).[3] As the record supports the findings and conclusions made by the bankruptcy court, we affirm.

## I.    Facts[4]

Appellants filed this adversary proceeding against debtor Ashlesha Nigam ("Debtor") as a result of her membership in Summit, LLC ("Summit"), an Illinois limited liability company.[5] Debtor, her brother Avneesh Nigam, and their father, Dr. Tara Nigam ("Dr. Nigam"), were all members of Summit. Dr. Nigam served as the sole manager of Summit.[6] The family established Summit to develop and lease a mixed-use commercial property known as A Perryville Place, in Rockford, Illinois ("Perryville Place"). Debtor's role in the project was to attract tenants and oversee construction of tenant improvements.[7] Appellants operated a retail store that sold "new age" products such as gems, crystals, and other gift-related items (the "Inventory").[8]

In May 2005, Debtor approached Ms. Cocoma as the owner of Cusco Jacks about moving her store location to one of the units in the soon to be constructed Perryville Place.[9] After months of courting and lease negotiations, Cusco Jacks and

---

[3]    All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

[4]    Appellants did not provide the trial exhibits in the record on appeal. Consequently, all facts are derived from the bankruptcy court's Order Dismissing Complaint or the transcript.

[5]    Order Dismissing Complaint ("Dismissal Order") at 1-2, *in* Appellants' App. at 601-02.

[6]    *Id.* at 2, *in* Appellants' App. at 602.

[7]    *Id.* at 3, *in* Appellants' App. at 603.

[8]    *Id.* at 1, *in* Appellants' App. at 601.

[9]    *Id.* at 2, *in* Appellants' App. at 602.

Summit executed a lease for retail space in January 2006 (the "Lease").[10] Because Perryville Place was new construction, the Lease required Cusco Jacks to bear the costs of building out the store up-front. Pursuant to the Lease, Summit would reimburse Cusco Jacks at a rate of $25 per square foot, or a maximum of $69,575.00, upon receipt of all contractor lien waivers for the build-out (the "Tenant Allowance Payment").[11]

Cusco Jacks moved into Perryville Place and opened for business in early July 2006, and Ms. Cocoma delivered all required build-out lien waivers to Summit.[12] When Summit did not tender the Tenant Allowance Payment to Cusco Jacks, Ms. Cocoma began asking Debtor and Summit when Cusco Jacks would receive the Tenant Allowance Payment. Cusco Jacks paid rent from July to October 2006,[13] but because it had yet to receive reimbursement for the build-outs, Cusco Jacks withheld rent for November and December 2006 and January and February 2007.[14] In February 2007, Summit's title insurance company informed Ms. Cocoma the Tenant Allowance Payment was ready.[15] However, the title insurance company then called Ms. Cocoma and told her the Tenant Allowance Payment would not be released to her without Summit's approval.[16] Ultimately, the title insurance company paid the Tenant Allowance Payment directly to Summit. In fact, the bankruptcy court found Dr. Nigam intervened and instructed the title company to

---

[10]   *Id.*, *in* Appellants' App. at 602.

[11]   *First Amended Complaint Objecting to Dischargeability Pursuant to 11 U.S.C. § 523* ("*Complaint*") at 6, *in* Appellants' App. at 11.

[12]   *Transcript of Trial Proceedings held on April 10, 2017* ("*Tr. Day 1*") at 71, *in* Appellants' App. at 107.

[13]   *Tr. Day 1* at 72-73, *in* Appellants' App. at 108-09.

[14]   *Tr. Day 1* at 73, *in* Appellants' App. at 109.

[15]   Dismissal Order at 3, *in* Appellants' App. at 603.

[16]   *Tr. Day 1* at 65-66, *in* Appellant's App. at 101-02.

pay the Tenant Allowance Payment to Summit instead of Cusco Jacks on account of past-due rent.[17]

In March 2007, Summit's attorney sent Cusco Jacks a check for $30,586.50 as payment of the Tenant Allowance Payment.[18] The letter accompanying the check stated Summit would settle its claims of almost $40,000 in unpaid rent by offsetting that amount from the $69,575 Tenant Allowance Payment.[19] On advice of counsel, Cusco Jacks returned the $30,586.50 check to Summit, rejecting any settlement.[20] To date, Cusco Jacks has not received the Tenant Allowance Payment.[21]

Cusco Jacks continued to operate at Perryville Place throughout 2007. But despite experiencing increasing sales,[22] Ms. Cocoma decided to close Cusco Jacks in early 2008. Cusco Jacks began liquidating inventory and published an advertisement indicating the store would close on March 31, 2008.[23] Debtor saw the ad and discussed it with her brother and father, Dr. Nigam, who became concerned that Summit would never receive the rents owed by Cusco Jacks. In fact, the bankruptcy court found Dr. Nigam, "was livid when he learned of the store closing [and] immediately contacted Summit's attorney and then informed his son that they would proceed with a distress warrant."[24] Debtor was not a part of these

---

[17]      Dismissal Order at 3, *in* Appellants' App. at 603.

[18]      *Tr. Day 1* at 67, *in* Appellants' App. at 103.

[19]      *Tr. Day 1* at 66-67, *in* Appellants' App. at 102-103.

[20]      *Transcript of Trial Proceedings held on April 11, 2017* ("*Tr. Day 2*") at 8, *in* Appellants' App. at 190.

[21]      *Id.*, *in* Appellants' App. at 190.

[22]      Dismissal Order at 9, *in* Appellants' App. at 609.

[23]      *Id.* at 4, *in* Appellants' App. at 604.

[24]      *Id.*, *in* Appellants' App. at 604.

discussions, and according to her brother, had been cut out of the process completely by their father.[25]

Late at night on March 24, 2008, Ms. Cocoma received a call from the alarm company that secured Cusco Jacks. Ms. Cocoma went to the store and discovered that Debtor's brother, several Summit employees, a security guard, and a locksmith had entered Cusco Jacks.[26] The locksmith was in the process of changing the locks to the building and Summit's employees were haphazardly boxing up Cusco Jack's Inventory. The packing continued until the early hours of March 25, 2008. Summit removed some of the Inventory from the store and caused other items to be stored in the basement of the store. The following day, Summit posted what appeared to be a notice of distress for rent pursuant to Illinois law on Cusco Jack's door.[27]

Debtor testified she had no involvement in entering Cusco Jacks or the execution of the distress warrant,[28] and Ms. Cocoma admitted Debtor was not present on the night of March 24, 2008.[29] Summit employees, including Debtor, inventoried Cusco Jacks' merchandise in the days following.[30] Ms. Cocoma testified a few of the items (a picture frame and candy dish) were on display in Dr. Nigam's personal office on the premises.[31] There are no facts in the record to suggest Summit wrongfully executed the distress warrant as Ms. Cocoma admitted

---

[25]     *Id.*, *in* Appellants' App. at 604.

[26]     *Id.*, *in* Appellants' App. at 604.

[27]     *Id.*, *in* Appellants' App. at 604.

[28]     *Transcript of Trial Proceedings held on April 12, 2017* ("*Tr. Day 3*") at 78, *in* Appellants' App. at 470.

[29]     *Tr. Day 2* at 62, *in* Appellants' App. at 244.

[30]     *Tr. Day 2* at 78, *in* Appellants' App. at 470.

[31]     *Tr. Day 1* at 125, *in* Appellants' App. at 161.

-5-

she withheld rent payments.[32] However, Ms. Cocoma believed she was justified in withholding rent because she had not received the Tenant Allowance Payment.

Appellants filed a complaint in Illinois state court against Summit, Dr. Nigam, and Debtor on March 26, 2008, alleging claims related to the wrongful eviction.[33] For various reasons, including Debtor's health issues and Dr. Nigam's death in November 2010, neither Summit's distress for rent proceeding nor Appellant's wrongful eviction suit were ever concluded.[34]

After Dr. Nigam passed away, the loan secured by Perryville Place was declared to be in default by Summit's bank because Dr. Nigam served as the primary guarantor on the promissory note.[35] The bank foreclosed, and the state court appointed a receiver.[36] After appointment of the receiver, Debtor had no role in the operations of Summit.[37] Another party eventually purchased Perryville Place. According to Debtor, these events precipitated her Chapter 7 bankruptcy filing in 2014.

On February 11, 2015, Summit's former counsel, Amy Silvestri, sent Ms. Cocoma a letter offering to release the Inventory if Appellants executed a release

---

[32] *Tr. Day 1* at 73, *in* Appellants' App. at 109.

[33] Dismissal Order at 4, *in* Appellants' App. at 604. The Court notes that Ms. Cocoma's testimony, based on Trial Exhibit 11, was that the *Complaint* was filed on March 26, 2008. *Tr. Day 1* at 136, *in* Appellant's App. at 172. However, if the bankruptcy court's stated date is incorrect, it is harmless error as it is irrelevant to the issues presented on appeal.

[34] Dismissal Order at 4, *in* Appellants' App. at 604.

[35] *Id.*, *in* Appellants' App. at 604.

[36] Because the record does not include any trial exhibits, the Court is unable to determine a time frame for the foreclosure and appointment of the receiver. However, the foreclosure must have occurred after Dr. Nigam's death in November 2010, since loss of Dr. Nigam's guaranty caused the default. Debtor testified the state court appointed the receiver "probably spring of 2011." *Tr. Day 3* at 104-05, *in* Appellants' App. at 496-97.

[37] *Tr. Day 3* at 87-89, *in* Appellants' App. at 479-81.

and waiver of their claims against Summit and its members.[38] The February 11, 2015 letter is not in the record on appeal, so we must rely on the bankruptcy court's conclusion that counsel intended "to assist the Debtor by obtaining a release of liability for her."[39] Appellants declined to settle and never obtained possession of the Inventory and its location is unknown.[40] At some point thereafter, Perryville Place's new owner met with Ms. Cocoma about picking up the Inventory.[41] Although the record is unclear as to the reason why, Perryville Place's new owner did not reach an agreement with Ms. Cocoma for turnover of the Inventory. Ms. Cocoma valued the Inventory in excess of $175,000, while Summit's inventory valuations suggested a value of $85,000.[42]

After Debtor filed a Chapter 7 petition on August 21, 2014, Appellants filed this adversary proceeding on November 17, 2014, alleging eight causes of action. Appellants' first cause of action alleged Debtor misrepresented the number of leases Summit had secured for Perryville Place to induce Cusco Jacks into signing the Lease and sought an exception from discharge pursuant to § 523(a)(2)(A) for false representation and fraud.[43] Causes of action two through eight sought an exception to discharge of debts pursuant to § 523(a)(6) for willful and malicious injury by Debtor based on fraud, wrongful eviction, conversion, trespass to chattels, trespass, nuisance, and wrongful distraint of property.[44]

---

[38]    *Id.* at 5, 14, *in* Appellants' App. at 605, 614.

[39]    *Id.* at 14, *in* Appellants' App. at 614.

[40]    *Id.* at 4-5, *in* Appellants' App. at 604-05.

[41]    *Id.* at 5, *in* Appellants' App. at 605. The state court authorized the new owner to do as it saw fit with the Inventory. *Id.* at 15, *in* Appellants' App. at 615.

[42]    *Id.* at 5, *in* Appellants' App. at 605.

[43]    *Complaint* at 9-10, *in* Appellants' App. 14-15.

[44]    *Id.* at 10-19, *in* Appellants' App. 15-24.

Following a lengthy four-day trial, the bankruptcy court entered its Order Dismissing Complaint ("Dismissal Order") ruling that Appellants failed to carry their burden of proving the elements of their § 523(a)(2)(A) claim. Specifically, the court concluded that Appellants had not proven: 1) that Debtor made a false representation, 2) that Debtor had an intent to deceive, or 3) that there were damages in fact stemming from the alleged misrepresentation.[45] Accordingly, the bankruptcy court dismissed the § 523(a)(2)(A) claim.

With regard to Appellants' claims for § 523(a)(6) willful and malicious injury based on wrongful eviction, conversion of the Inventory and conversion of the Tenant Allowance Payment, the bankruptcy court concluded Debtor was not liable because Appellants failed to prove she directed or was otherwise involved in any of the allegedly wrongful acts.[46] The bankruptcy court also considered whether Debtor could be held vicariously liable for Summit's actions as a member of the company, but concluded she was not liable because the plain meaning of § 523(a)(6)'s language "for willful and malicious injury by the debtor," meant Debtor must have been a "direct participant" in the wrongful act.[47] Finally, the bankruptcy court concluded the actions of Summit's attorney in denying return of the Inventory unless Appellants released their claims against Debtor could not be imputed to Debtor. Debtor's reasonable reliance on the advice of counsel precluded a finding of malicious intent and injury.[48] Accordingly, the bankruptcy court dismissed all claims brought pursuant to § 523(a)(6).

---

[45]     Dismissal Order at 8-9, *in* Appellants' App. at 608-09.

[46]     *Id.* at 12, *in* Appellants' App. at 612.

[47]     *Id.* at 14, *in* Appellants' App. a 614.

[48]     *Id.* at 15, *in* Appellants' App. at 615.

## II.     Jurisdiction and Standard of Review

"With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from 'final judgments, orders, and decrees' of bankruptcy courts within the Tenth Circuit."[49] A decision is considered final "if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'"[50] An order resolving all claims asserted in an adversary proceeding is a final order for purposes of 28 U.S.C. § 158(a).[51] Neither Appellants nor Debtor elected for this appeal to be heard by the United States District Court pursuant to 28 U.S.C. § 158(c). Accordingly, this Court has jurisdiction over this appeal.

A bankruptcy court's legal conclusions are reviewed *de novo*,[52] while the "factual findings, which underpin [the bankruptcy court's] legal conclusions, are reviewed for clear error."[53] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[54] A factual finding is "clearly erroneous" when "it is without factual support in the

---

[49]     *Straight v. Wyo. Dep't of Trans. (In re Straight)*, 248 B.R. 403, 409 (10th Cir. BAP 2000) (quoting 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1)).

[50]     *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)).

[51]     *Adelman v. Fourth Nat'l Bank & Tr. Co., N.A., of Tulsa (In re Durability, Inc.)*, 893 F.2d 264, 266 (10th Cir. 1990) ("the appropriate 'judicial unit' for application of [ ] finality requirements in bankruptcy is not the overall case, but rather the particular adversary proceeding" (citing multiple cases)).

[52]     *Lang v. Lang (In re Lang)*, 293 B.R. 501, 508 (10th Cir. BAP 2003) (first citing *Phillips v. White (In re White)*, 25 F.3d 931, 933 (10th Cir. 1994), and then citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir. 1996)).

[53]     *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 188 (10th Cir. BAP 2017) (citing *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997)).

[54]     *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

record, or, if the appellate court, after reviewing all the evidence is left with the definite and firm conviction that a mistake has been made."[55]

## III.  Analysis

We begin by defining the scope of this Court's review. Although Appellants sought the denial of dischargeability of certain debts pursuant to § 523(a)(2)(A) and (a)(6), Appellants' brief only addresses claims pursuant to § 523(a)(6). Accordingly, our review is confined to § 523(a)(6).[56]

Section 523(a) provides, "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt  . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."[57] In *Kawaauhau v. Geiger*, the Supreme Court clarified the willful and malicious standard requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[58] The Tenth Circuit explains the "willful and malicious injury" language means "that the actor intended the consequences of the act, not simply the act itself."[59] "[T]o constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from

---

[55]     *Sears*, 565 B.R. at 188 (quoting *LeMaire ex rel. LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir. 1987)).

[56]     *Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005)("The failure to raise an issue in an opening brief waives that issue." (citing *State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n.7 (10th Cir. 1994))); *Bronsen v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("the omission of an issue in an opening brief generally forfeits appellate consideration of that issue" (citing *Wyoming v. Livingston*, 443 F.3d 1211, 1216 (10th Cir. 2006))).

[57]     11 U.S.C. § 523(a)(6).

[58]     523 U.S. 57, 61 (1998).

[59]     *Berrien v. Van Vuuren (In re Berrien)*, No. 07-1294, 280 F. App'x 762, 766 (10th Cir. June 4, 2008) (quoting *Kawaauhau*, 523 U.S. at 61-62).

-10-

it.'"[60] The act must also be malicious, *i.e.* "intentional, wrongful, and done without justification or excuse."[61] The Tenth Circuit instructs that a reviewing court must find the act and the injury both willful and malicious; "[w]ithout proof of *both*, an objection to discharge under [§ 523(a)(6)] must fail."[62]

This Court previously held "[§] 523(a)(6) requires proof of: (1) an intentional action by the defendant; (2) done with the intent to harm; (3) which causes damage (economic or physical) to the plaintiff; and (4) the injury is the proximate result of the action by the defendant."[63] The Tenth Circuit explains a willful and malicious injury "may apply to a broad range of [tortious] conduct causing harm to people or property."[64]

The bankruptcy court considered whether Debtor's acts rose to the level of causing willful and malicious injury in relation to 1) Cusco Jacks' eviction (including trespass, trespass to chattels, and nuisance); 2) distress for rent; 3) conversion of the Inventory; and 4) conversion of the Tenant Allowance Payment. The bankruptcy court found that, while these actions may have caused willful and malicious injury to Appellants, "Debtor had no direct involvement in . . . the eviction or the seizure of [I]nventory" nor was she the person who redirected the

---

[60]     *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir 2004) (quoting *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999)).

[61]     *Mountain Am. Credit Union v. Trujillo (In re Trujillo)*, No. 13-1095, 2014 WL 2336645, at *2 (Bankr. D. N.M. May 29, 2014) (citing *Fletcher v. Deerman (In re Deerman)*, 482 B.R. 344, 369 (Bankr. D. N.M. 2012)).

[62]     *Moore*, 357 F.3d at 1129.

[63]     *Hernandez v. Musgrave (In re Musgrave)*, No. CO-10-049, 2011 WL 312883, at *7 (10th Cir. BAP Feb. 2, 2011) (quoting *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 790 (Bankr. D. Colo. 2002)).

[64]     *Berrien*, 280 F. App'x at 766 (quoting 4 *Collier on Bankruptcy* ¶ 523.12[1] (15th ed. Rev. 2008)).

Tenant Allowance Payment.[65] The bankruptcy court also concluded "Debtor cannot be held vicariously liable for the acts of willful and malicious injury committed by Summit or Dr. Nigam."[66] As there was no causal link between Debtor and the willful and malicious injury, the bankruptcy court dismissed the § 523(a)(6) claims.

## A. Conversion

### i. Illinois Tort of Conversion

Appellants argue the bankruptcy court erred in applying the Illinois law of conversion, which requires a plaintiff to prove: "(1) his right to the property; (2) that this right includes the absolute, unconditional right to immediate possession of the property; (3) he has demanded possession of the property; and (4) the defendant took control or claimed ownership of the property wrongfully and without authorization."[67] Appellants allege the bankruptcy court erred by failing to consider Debtor's refusal to return the Inventory as an extension of conversion, in addition to the initial seizure of the Inventory.

The Dismissal Order does not analyze the elements of conversion, but such analysis is unnecessary. Denial of the dischargeability of debts pursuant to § 523(a)(6) requires more than an intentional act; a plaintiff must also prove a willful and malicious injury. Thus, a complete analysis under § 523(a)(6) requires review of whether the debt "is the result of a willful and malicious act intended to do injury to a person."[68] The bankruptcy court recognized this concept, as it explained,

---

[65]      Dismissal Order at 12, *in* Appellants' App. at 612.

[66]      *Id.* at 14, *in* Appellants' App. at 614.

[67]      *McNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 796 (N.D. Ill. 2010) (quoting *Edwards v. City of Chicago*, 905 N.E. 2d 897, 899-900 (Ill. App. Ct. 2009)).

[68]      *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

> Early on, the Supreme Court established that "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934). When exactly conversion crosses the line into willful and malicious injury is often an inherently subjective determination.[69]

Whether a debtor's actions amount to conversion under state law is simply not dispositive of whether the underlying claim is nondischargeable under § 523(a)(6).[70]

Accordingly, failure to conduct an analysis of the underlying conversion resulted in no error because the bankruptcy court appropriately considered whether the conversion resulted in a willful and malicious injury.

### ii.     Conversion of the Inventory

Appellants argue the bankruptcy court erred in concluding Debtor did not participate in the conversion. Appellants suggest Debtor was aware Summit had the locks to the store changed and seized the Inventory, participated in itemizing the Inventory, knew Summit had not received legal authority to seize the Inventory, never made the Inventory available to Appellants, and never took action to cause Summit to return the Inventory.

First, Appellants do not argue Summit's seizure of the Inventory violated Illinois distress for rent statutes. The applicable Illinois statute provides "[i]n all cases of distress for rent, the landlord, by himself or herself, his or her agent or

---

[69]     Dismissal Order at 10, *in* Appellants' App. at 610. *See also Mountain Am. Credit Union v. Trujillo (In re Trujillo)*, No. 13-1095, 2014 WL 2336645, at *3 (Bankr. D.N.M. May 29, 2014)("[n]ot every conversion constitutes a willful and malicious injury." (quoting *Hernandez v. Musgrave (In re Musgrave)*, No. CO-10-049, 2011 WL 312883, at *11 (10th Cir. BAP Feb. 2, 2011))).

[70]     *State Farm Mut. Auto. Ins. Co. v. Rodriguez (In re Rodriguez)*, 568 B.R. 328, 342 (Bankr. S.D. Cal. 2017) (citing *Andrews v. Manser (In re Manser)*, 99 B.R. 434, 435-36 (9th Cir. BAP 1989)).

attorney, may seize for rent any personal property of his or her tenant."[71] Upon seizure, a landlord must file a copy of the distress warrant and an inventory of the property levied upon with the court.[72] This statute "grants a landlord a common law lien on a tenant's property for the non-payment of rent that is perfected by the filing of a distress warrant and inventory with the clerk of court."[73]

Regardless of whether Debtor had knowledge of, or participated in, the seizure of the Inventory, the record supports the findings that: Appellants defaulted on rent payments for November 2006 to February 2007; agents of Summit executed a distress for rent warrant on the basis of the default; agents of Summit conducted an inventory of the items seized; and Appellants filed claims against Summit roughly twenty-four hours after execution of the distress for rent warrant but before Summit could file the distress for rent claim and itemized Inventory in Illinois court.

Appellants fail to show evidence in the record suggesting Summit and its employees acted inconsistently with the distress for rent statute or otherwise acted in bad faith or with malicious intent. Summit's actions in accordance with Illinois law to preserve its lien rights undermine Appellants' argument that Debtor acted with willful and malicious intent to cause injury.[74] Even if Debtor had knowledge of Summit's execution of the distress for rent warrant, a fact she denied and which

---

[71]     735 Ill. Comp. Stat. 5/9-301 (1982).

[72]     735 Ill. Comp. Stat. 5/9-302 (1982).

[73]     *SW Bank of St. Louis v. Poulokefalos*, 931 N.E.2d 285, 291-92 (Ill. App. Ct. 2010) (first citing 735 Ill. Comp. Stat. 5/9-302 (1982), then citing *First State Bank of Maple Park v. De Kalb Bank*, 530 N.E.2d 544 (Ill. App. Ct. 1988)).

[74]     *See Dorr, Bently & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1528 (10th Cir. 1993) ("conversion of another's property . . . *without justification or excuse* . . . is a willful and malicious injury" (quoting 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 523.16[1] (15th ed. 1992)) (emphasis added)); *Dering Pierson Grp., LLC v. Kantos (In re Kantos)*, 579 B.R. 846 (8th Cir. BAP 2018) (affirming denial of claim for willful and malicious injury where debtor intended to ensure lien rights were protected).

-14-

the evidence did not establish, acting in compliance with state law negates any finding Debtor intended to cause willful and malicious injury pursuant to § 523(a)(6) as the seizure was effected pursuant to Illinois law based on the admittedly past-due rent to protect the rights of Summit as landlord.

To the extent Appellants argue the bankruptcy court failed to recognize a claim for conversion can result from a landlord's improper disposition of property seized pursuant to a distress for rent warrant, the argument fails. The bankruptcy court correctly noted, "[i]t is conversion for a landlord to seize property under the distress for rent procedure and then to improperly dispose of it."[75] But Ms. Cocoma admitted Cusco Jacks withheld rent from Summit, making the distress for rent lawful.[76] If Appellants reasonably disputed the amount of rent owed, they were allowed to counterclaim and assert defenses.[77] However, many delays prevented the state court from hearing the distress proceeding, meaning Summit lawfully retained possession of the Inventory until Perryville Place came under new ownership.

Furthermore, the only evidence of improper disposition of the Inventory pointed solely to Dr. Nigam and his personal use of items of the Inventory. No evidence suggested, much less established, that Debtor controlled or directed Dr. Nigam in that regard or misappropriated any Inventory herself. At the end of the day, there was no evidence from which the bankruptcy court could find that Debtor directed or controlled the seizure, held or used the Inventory, much less that Debtor took any actions with the specific intent to wrongfully deprive Appellants of the Inventory. Additionally, numerous circumstances beyond Debtor's control,

---

[75]     Dismissal Order at 12, *in* Appellants' App. at 612 (citing *Sheetz v. Baker*, 38 Ill. App. 349 (Ill. App. Ct. 1890)).

[76]     *Cottrell v. Gerson*, 16 N.E.2d 529, 536 (Ill. App. 1938) ("distress for rent is proper and legal where there is *any* rent due" (citing 16 *Ruling Case Law* pp. 1007, 1028-29)).

[77]     Ill. Comp. Stat. 5/9-306 (1982).

including the death of Dr. Nigam, a subsequent foreclosure, and the appointment of a receiver, all postponed the adjudication of the parties' claims against each other and raised sufficient questions regarding Summit's continuing control over the Inventory. Accordingly, we find no legal error.

Appellants' next argument addresses the deprivation element of conversion under Illinois law, asserting Debtor never made the Inventory available to them. But there is no evidence in the record that Appellants ever made a demand for the return of the Inventory from Debtor or that Debtor had continuing control over the Inventory.[78]

Similarly, Appellants argue that because Debtor facilitated the return of Ms. Cocoma's personal items seized along with the Inventory, Debtor had control and authority over the Inventory.[79] However, Illinois statute limits seizure to the personal property of a tenant.[80] As Cusco Jacks was Summit's tenant, the return of Ms. Cocoma's personal property further supports the finding that Summit acted lawfully in accordance with Illinois law in seizing the Inventory.

Finally, Appellants argue Debtor's intent to deprive them of the Inventory is evidenced by her attorney's offer to return the Inventory in exchange for release of Appellants' claims against her and Summit. However, seeking a release of Appellants' claims evidences Debtor's intent to absolve herself of potential litigation, not necessarily an intent to cause injury to Appellants. At the time, the status of the Inventory was in limbo as no Illinois state court had determined who had superior rights to the Inventory. Silvestri, long-time counsel for Summit,

---

[78]    On one occasion, Ms. Cocoma attempted to have a Summit representative sign a letter regarding Summit's retention of the Inventory. However, both Summit and Debtor refused to sign the letter. Unfortunately, the letter itself is not included in the record on appeal and, therefore, sheds little light on whether it was a demand for return of the Inventory.

[79]    Appellants' Br. 14; *see also Tr. Day 2* at 65, *in* Appellants' App. at 247.

[80]    735 Ill. Comp. Stat. 5/9-301(1982).

suggested a course of action which was executed by sending the letter to Appellants. The bankruptcy court found Debtor's reliance on Silvestri to guide and advise her and Summit to be necessary and reasonable given her lack of sophistication and knowledge as to legal matters. It only follows that the bankruptcy court would similarly conclude that the offer to return the Inventory in exchange for releases failed to evidence a willful and malicious intent to violate Appellants' rights with respect to the Inventory given the existence of pending litigation and the unknown status of rights to the Inventory.

### iii.   Conversion of the Tenant Allowance Payment

Appellants argue Debtor participated in the conversion of the Tenant Allowance Payment because she coordinated the build-out but took no action to remedy the redirection of funds. Yet the record is void of any evidence of Debtor's participation in, or intent to cause injury by, redirecting the Tenant Allowance Payment. Appellants provide no evidence to suggest the bankruptcy court erred in finding Dr. Nigam circumvented Debtor in directing the title insurance company to issue the Tenant Allowance Payment directly to Summit.

Once Summit's attorney got involved and sent Cusco Jacks a check for $30,586.50 after offsetting past due rent and proposing a settlement agreement, there remains no evidence Debtor played any role in the disposition of the Tenant Allowance Payment. Appellants refused to accept the check under the conditions proposed by counsel. Appellants do not appear to dispute the bankruptcy court's findings on the issue.[81] Nowhere in Appellants' version of the facts (which adopt the bankruptcy court's findings almost verbatim) do Appellants suggest Debtor participated in the redirection of the Tenant Allowance Payment or proposal of settlement with respect thereto.

---

[81]   Appellants' Br. 8 (adopting the bankruptcy court's findings verbatim).

The burden of proving facts in support of a § 523(a)(6) claim falls on Appellants.[82] Appellants failed to prove facts to support a finding that Debtor was liable for conversion of the Inventory or the Tenant Allowance Payment, much less the additional burden of proving such conversion was willful and malicious pursuant to § 523(a)(6). Accordingly, the bankruptcy court did not err in finding Debtor did not directly or actively participate in conversion.

## B. Vicarious Liability

Appellants argue the bankruptcy court erred in its application of Illinois law on vicarious liability, suggesting Debtor is liable for Summit's acts. The bankruptcy court found Dr. Nigam, as sole manager of Summit, caused Cusco Jacks' eviction and deprivation of the Inventory and the Tenant Allowance Payment and, therefore, could be liable to Cusco Jacks under the theory of vicarious liability.[83] The bankruptcy court then considered whether Debtor could be vicariously liable for Dr. Nigam's actions due to her membership in Summit. The bankruptcy court concluded the plain language of § 523(a)(6), "willful and malicious injury *by the debtor*," requires a debtor to be a "direct participant" in the willful and malicious act.[84] Debtor's vicarious liability, in and of itself, is not a substitute for Debtor willfully and maliciously injuring Appellants.[85]

---

[82] *McCain Foods USA Inc. v. Shore (In re Shore)*, 317 B.R. 536, 542 (10th Cir. BAP 2004) (citing *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 785 (10th Cir. BAP 1997)).

[83] Dismissal Order at 12-13, *in* Appellants' App. at 612-13.

[84] *Id.* at 14, *in* Appellants' App. at 614.

[85] *Id.*, *in* Appellants' App. at 614 ("The plain meaning of [§ 523(a)(6)] compels this Court to find that the Debtor in this case must have been a direct participant or the person directing the actions of others before finding the debt to be nondischargeable.").

Appellants assert that in "Illinois, corporate officers are liable for torts if they participated in the conduct giving rise to that liability."[86] However, the Illinois Court of Appeals more thoroughly explained,

> any participation in the tort does not necessarily subject an officer or director to individual liability. Personal liability for actions taken on behalf of the corporation attaches only when the officer or director is alleged to have taken part in the wrongful act *initially giving rise* to the corporation's liability.[87]

This suggests Debtor would not be liable for Summit's (or Dr. Nigam's) actions unless she took part in the initial seizure of the Inventory or redirection of the Tenant Allowance Payment. The bankruptcy court's factual findings expressly found Debtor did not initially cause or participate in either act. Since Appellants adopted the bankruptcy court's findings in their brief before this Court, they necessarily failed to demonstrate the findings are clearly erroneous.[88]

Furthermore, while it is clear Illinois may impose personal liability on corporate officers or directors, the Illinois statutes expressly provide that a member shall not be liable for obligations of a limited liability company solely based on membership.[89] "There is no Illinois Supreme Court decision on whether piercing the corporate veil is applicable to limited-liability companies."[90] Thus, Appellants

---

[86]    Appellants' Br. 15 (quoting *Itofca, Inc. v. Hellhake*, 8 F.3d 1202, 1204 (7th Cir. 1993)).

[87]    *IOS Capital, Inc. v. Phoenix Printing, Inc.*, 808 N.E.2d 606, 611 (Ill. App. Ct. 2004) (citing *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985)).

[88]    *See* Appellants' Br. 8 ("Dr. Nigam insisted that the title company send the check to him."); Appellants' Br. 9 ("While the trial court found that the Debtor was not directly involved in the lockout or initial seizure of Cusco's inventory . . . , the Debtor did help with compiling the inventory list in the days following the seizure.").

[89]    805 Ill. Comp. Stat. 180/10-10 (1998) ("A member or manager is not personally liable for a debt, obligation, or liability [whether arising in contract, tort, or otherwise] of the company solely by reason of being or acting as a member or manager.").

[90]    *Green Skyline Solar, LLC v. Sunpin Solar Dev., LLC*, No. 16-cv-7659, 2017
(continued...)

have failed to show the bankruptcy court committed legal error in dismissing Appellants' corporate veil piercing arguments.

Finally, Appellants neglect § 523(a)(6)'s requirement of a "willful and malicious injury *by the debtor*."[91] As the bankruptcy court explained, the "plain meaning of [§ 523(a)(6)] compels this Court to find that the Debtor in this case must have been a direct participant or the person directing the actions of others before finding the debt to be nondischargeable."[92] Other bankruptcy courts more plainly state, "application of vicarious liability would effectively vitiate the § 523(a)(6) requirement that only debts resulting from *willful* acts committed *by the debtor* be nondischargeable."[93] While courts have excepted debts from discharge under the theory of vicarious liability in proceedings under other subsections of § 523(a), this Court's research reveals no scenario where a debtor was held vicariously liable, resulting in denial of discharge pursuant to § 523(a)(6), and sees no reason to deviate from the prevailing view.[94]

---

(...continued)
WL 661593, at *2 (N.D. Ill. Feb. 16, 2017); *Seater Const. Co. v. Deka Invs., LLC*, No. 2-12-1140, 2013 Ill. App. 2d 121140-U, at *8 (Ill. App. Ct. June 24, 2013) ("we note that no Illinois case has held that the doctrine of piercing the corporate veil applies to an Illinois limited liability company.").

[91]     11 U.S.C. § 523(a)(6) (emphasis added).

[92]     Dismissal Order at 14, *in* Appellants' App. at 614.

[93]     *Thatcher v. Austin (In re Austin)*, 36 B.R. 306, 312 (Bankr. M.D. Tenn. 1984); *see also Caci v. McDonald (In re Brink)*, 333 B.R. 560, 568 (Bankr. D. Mass. 2005) ("Imputed liability is insufficient." (quoting *Columbia Farms Distrib., Inc. v. Maltais (In re Maltais)*, 202 B.R. 807, 811 (Bankr. D. Mass. 1996))); *Davis v. Tomasek (In re Tomasek)*, No. 05-10777, 175 F. App'x 662, 668 (5th Cir. Apr. 7, 2006) (noting bankruptcy court explained "courts overwhelmingly have rejected such vicarious liability under § 523(a)(6).").

[94]     *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1151 (11th Cir. 2001) (holding under Supreme Court case law, debts from fraud imputed to debtor are nondischargeable); *Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 751 (5th Cir. 2001) (holding innocent partner could not discharge liability for fraud of partners pursuant to § 523(a)(2)(A)).

-20-

Therefore, the bankruptcy court did not err in finding Debtor was not a "direct participant" in the conversion sufficient to support a finding of willful and malicious injury pursuant to § 523(a)(6).

## C. Reliance on Advice of Counsel

Finally, Appellants argue the bankruptcy court erred in finding Debtor's reliance on advice of legal counsel shielded her from liability for willful and malicious injury. This argument appears to address the bankruptcy court's findings and conclusions that the actions of Summit's counsel in sending the February 11, 2015 letter to Appellants concerning return of the Inventory could not be imputed to Debtor under the theory of agency.[95] The bankruptcy court concluded, "[i]f the [D]ebtor reasonably relied on the advice of counsel, then this fact might preclude a finding that the actions were 'malicious,' meaning without just cause or excuse."[96] The bankruptcy court then found Debtor "was unsophisticated" and "reasonably relied on [counsel] to guide her through the legal process."[97]

Appellants argue case law cited by the bankruptcy court is distinguishable because it involved the enforcement of a covenant not to compete and noted a court must examine "evidence of the debtor's motives" to determine whether "the requisite 'malice' in addition to 'willfulness' is present."[98] Admittedly, the bankruptcy court made no express findings as to the motivations involved in sending the February 11, 2015 letter, except to say counsel clearly "wanted to

---

[95]    Dismissal Order at 15, *in* Appellants' App. at 615.

[96]    *Id.*, *in* Appellants' App. at 615 (first citing *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1528 (10th Cir. 1993), and then citing *Pekler v. Ikerd (In re Peklar)*, 260 F.3d 1035, 1038-39 (9th Cir. 2001)).

[97]    *Id.*, *in* Appellants' App. at 615.

[98]    Appellants' Br. 17 (quoting *Pasek*, 983 F.3d at 1527).

assist the Debtor by obtaining a release of liability for her."[99] However, the bankruptcy court made clear its findings that it was reasonable for Debtor to rely on Silvestri to advise her on Summit's legal entanglements with Appellants.[100] And, although not an express finding, by implication, the bankruptcy court found Debtor's reliance on counsel to be in good faith. Consequently, the bankruptcy court did not err in concluding Debtor did not act willfully and maliciously in following the advice of her lawyer and allowing the 2015 letter to be sent to Appellants proposing a settlement in lieu of continued litigation.[101]

The bankruptcy court also found the 2015 letter to Appellants "did not go so far as to say that [Appellants] could not remove the [Inventory, counsel] merely made suggestions as to how best to proceed."[102] However, Appellants' appendix does not include a copy of the 2015 letter referenced by the bankruptcy court. Where an appellant fails to supply the Court with an adequate record, including exhibits, "we will not determine that the bankruptcy court's factual findings are clearly erroneous."[103] Accordingly, we do not consider this argument on appeal.

---

[99]     Dismissal Order at 14, *in* Appellants' App. at 614.

[100]     *Id.* at 15, *in* Appellants' App. at 615.

[101]     *Dorr, Bently & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524 (relying on advice of counsel that covenant not to compete was unenforceable constituted just cause or excuse against § 523(a)(6) claims); *see United Orient Bank v. Green*, 215 B.R. 916, 928 (S.D.N.Y. 1997) ("[R]eliance on counsel, in an appropriate case, could preclude one seeking a determination of nondischargeability from establishing the culpable state of mind required by Section 523(a)(6)."); *cf. The Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620, 629 (6th Cir. BAP 2000) (finding reliance on advice of counsel is generally not a defense to § 523(a)(6) claims, but courts may recognize it where reliance was reasonable and debtor acted in good faith).

[102]     Dismissal Order, *in* Appellants' App. at 615.

[103]     *Gonzales v. Internal Revenue Serv. (In re Silver)*, 303 B.R. 849, 857 (10th Cir. BAP 2004).

In sum, the evidence does not support a finding that Debtor acted with the intent to willfully and maliciously injure Appellants in following the advice of counsel, Silvestri, and allowing her to send the 2015 letter to Appellants.

**IV. Conclusion**

Upon review of the record and the bankruptcy court's findings and conclusions, the bankruptcy court did not abuse its discretion in dismissing Appellants' claims for nondischargeabilty of debts pursuant to § 523(a)(6). We agree Appellants failed to show Debtor acted with the requisite intent necessary for a finding of a willful and malicious injury because Summit acted in accordance with Illinois statute in executing the distress for rent warrant. Additionally, we note Appellants failed to provide the Court with an adequate record on appeal to consider many of the issues raised as the record did not contain the exhibits received by the bankruptcy court. Accordingly, judgment of the bankruptcy court is AFFIRMED.